## STATE OF CONNECTICUT *v.* WILLIAM MCNELLIS
### (4558)

DUPONT, C. J., DALY and O'CONNELL, Js.

Argued April 12—decision released August 9, 1988

*James E. Swaine,* for the appellant (defendant).

*Judith Rossi,* deputy assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

DUPONT, C. J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), larceny in the first degree in violation of General Statutes § 53a-122 (a) (2), attempted assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2), 53a-59 (a) (1), and 53a-8, conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) (2) and 53a-134 (a) (2), and larceny in the first degree in violation of General Statutes §§ 53a-119 (8) and 53a-122 (a) (3).

The defendant claims that the trial court erred (1) in denying his motions to dismiss and to suppress physical evidence on the ground that his arrest was not based on probable cause, (2) by instructing the jury on the missing witness rule; *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 165 A.2d 598 (1960); and by allowing the state to argue missing witness inferences prior to the court's ruling on such inferences, (3) in denying the defendant a right to be present during the court's voir dire of the individual jurors concerning jury tampering, and in denying the defendant's subsequent motion for a mistrial, (4) in denying his motions for a mistrial filed on the ground that he was denied a fair trial by the trial court's allowing the testimony of a state trooper that a gun in evidence in this case was also test-

fired and compared to bullets in another criminal matter, and allowing the testimony of a criminalist, as to the existence of a red stain on an alleged accomplice's pants which were seized at the time of arrest, when the state had failed to disclose that evidence pursuant to discovery orders, (5) in refusing to allow the defendant to proceed on his motion to suppress identification testimony and in allowing into evidence identification testimony which had been tainted by a prior allegedly suggestive show up, and (6) in illegally imposing sentence upon the defendant and in refusing to hear the merits of his motion to vacate the alleged illegal sentence. We find no reversible error.

The jury could reasonably have found the following facts. Two men wearing ski masks and gloves robbed a branch office of the Jefferson Federal Savings Bank located at the Bella Vista apartment complex in New Haven. At the time of the robbery, three bank tellers and several customers were inside the bank. The tellers were able to testify as to the descriptions of the two robbers. One of the perpetrators was described as a tall, thin man, with mustache hairs protruding through his mask, wearing a green jump suit and blue and white high-topped sneakers. The other perpetrator was described as a shorter man with a heavier build, fair skin, very light eyes, and a harsh voice, wearing old, bell-bottomed blue jeans, a checked tweed coat over a dark sweatshirt, and grey suede shoes.

Both of the perpetrators were armed with handguns. They emptied the contents of the cash drawers and a vault drawer into a green duffel bag and a pillowcase. Among the stolen contents was bait money, which contained exploding red dye packets.

Maintenance personnel had seen two masked men get out of a green Thunderbird, which was parked in the bank driveway with its motor running, and then enter

the bank. A building superintendent got into the Thunderbird and started to drive it away from the bank. When the robbers came out of the bank, they chased after the automobile, banged on it, and then fired several shots. At that time, the dye packets in the bait money exploded, discharging a red dye into the air. The perpetrators were then observed fleeing across the street and into a bushy area near a building diagonally across from the bank.

After the superintendent told a security guard to call the police, he and another superintendent saw the defendant, who was breathing heavily, perspiring, and had a leaf stuck to his cheek, emerge from the bushy area at the top of the embankment. It had been raining heavily that day, but at the time of the robbery it was only misting. Behind the defendant was a taller man, later identified as Raymond Flinter. The defendant stated: "Did you see 'em? They robbed the bank." The superintendent asked in which direction the robbers went, and the defendant responded that the robbers had gone down the hill, away from the area, and that one of the perpetrators was a black man.

Flinter, who was wearing white and blue high-topped sneakers, started walking rapidly toward another building. He was subsequently apprehended by a uniformed police officer responding to the robbery alarm. Upon noticing that Flinter was in police custody, the superintendent suggested that the defendant inform the police that his friend was not involved in the robbery incident. The defendant responded that he did not know the man, but had only just met him as they came up the hill. The defendant then walked hastily away. The superintendent and other persons congregating in the area pointed out to Officer George Hill, who had just arrived on the scene, that one of the perpetrators was around the corner of a building. Hill proceeded around the corner of the building and saw the defendant walk-

ing away from the commotion, looking wet or sweaty, muddy, and unkempt. Hill then identified himself as a police officer and took the defendant into custody. At the time of his arrest, the defendant was wearing a dark sweatshirt, denim jeans, and grey suede shoes. These articles of clothing were seized from his person pursuant to a search incident to his arrest.

## I

The defendant first claims that the trial court erred in denying his motion to suppress evidence seized at the time of his arrest, on the ground that there was no probable cause to arrest him, as there existed no facts known to the officer to conclude that he was one of the bank robbery perpetrators. Accordingly, the defendant contends that the search incident to that arrest violated his right to be free of unreasonable searches and seizures under the federal[1] and state[2] constitutions. We disagree.

We recognize the principle that subject only to a few well defined exceptions, a search conducted without a warrant issued upon probable cause is an unreasonable

[1] The fourth amendment to the United States constitution provides in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . . " This constitutional right is made applicable to the states through the fourteenth amendment to the United States constitution. *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[2] Article first, § 7 of the Connecticut constitution provides in pertinent part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . . " In support of his state constitutional claim, the defendant directs this court's attention to the decision in *State* v. *Kimbro,* 197 Conn. 219, 233, 496 A.2d 498 (1985), as support for the proposition that the state constitution affords more substantive protection to citizens than does the federal constitution in the determination of probable cause to arrest. The defendant has failed, however, to provide any analysis to distinguish or to amplify his state rights with respect to this issue. We decline to undertake such an analysis. See *State* v. *Carey,* 13 Conn. App. 69, 72 n.2, 534 A.2d 1234 (1987).

search. *State* v. *Badgett,* 200 Conn. 412, 423, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). A specifically established exception to this rule provides, however, that where evidence obtained without a warrant is obtained as a result of a valid search and seizure incident to a lawful arrest, such evidence is not illegally obtained and is therefore admissible. *Chimel* v. *California,* 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969); *State* v. *Cobuzzi,* 161 Conn. 371, 377–79, 288 A.2d 439 (1971), cert. denied, 404 U.S. 1017, 92 S. Ct. 677, 30 L. Ed. 2d 664 (1972). It is the state's burden at trial to establish this exception. *State* v. *Badgett,* supra 424; *State* v. *Lizotte,* 11 Conn. App. 11, 17, 525 A.2d 971, cert. denied, 204 Conn. 806, 528 A.2d 1154 (1987). The issue that we must decide, then, is whether the search of the defendant was incident to a lawful warrantless arrest.

Pursuant to subsection (b) of General Statutes § 54-1f, a police officer is authorized to arrest, without a warrant, "any person who the officer has reasonable grounds to believe has committed or is committing a felony." The term "reasonable grounds," within the meaning of § 54-1f (b), has been interpreted to mean "probable cause," as that term has been defined by judicial opinion. *State* v. *Dennis,* 189 Conn. 429, 431, 456 A.2d 333 (1983). Probable cause, sufficient to support a warrantless arrest, exists when " ' " 'the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a felony had been committed' " ' "; *State* v. *Dennis,* supra, 431; *State* v. *Gaspano,* 194 Conn. 96, 105, 480 A.2d 509 (1984), cert. denied, 474 U.S. 828, 106 S. Ct. 90, 88 L. Ed. 2d 74 (1985); *State* v. *Wilson,* 178 Conn. 427, 435–36, 423 A.2d 72 (1979); and that the person arrested committed the felony. *State* v. *DeChamplain,* 179 Conn. 522, 529, 427 A.2d 1338 (1980).

" 'The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction.' " *State* v. *Dennis,* supra. In this case, we consider solely the knowledge of Hill, the arresting officer, at the time of the arrest because that is the only evidence pertaining to the issue of probable cause. Hill was aware of certain facts prior to the defendant's arrest. On the day of the bank robbery, Hill was on duty and was assigned to the street crime division of the New Haven police department. As a member of the street crime division, Hill was mainly involved with crimes concerning robbery or narcotics. At approximately 1:30 p.m., on May 31, 1984, Hill and his partner heard a radio alarm that came over the police communication system, signalling them that a bank robbery had occurred at the Jefferson Federal Savings Bank located at the Bella Vista apartment complex. They responded to that location and Hill dropped off his partner at the bank. Hill had intimate knowledge of the Bella Vista housing complex because his mother lived there. Hill noticed that it had just stopped raining, that the air was moist, and the ground muddy. He then heard a second radio transmission that one officer was at the top of the hill, that a bank robbery had occurred, and that two white males had exited the bank and were running up the hill into some bushes. Hill went to the top of the hill where another officer had Flinter in custody. Hill then heard a third radio broadcast describing one of the perpetrators as a tall, thin man. The broadcast also informed Hill that one of the perpetrators was wearing a long tan overcoat and the other a long purplish-color overcoat. Hill noticed that the man in custody, Flinter, was a tall, thin man.

At this time, there were numerous people gathered around the area and some of them said to Hill that "another subject was fleeing that way," and pointed

around the corner to the direction of the back of another building. Hill went to the rear of the building where he saw the defendant. Although the defendant was not wearing the clothes described in the radio broadcast, Hill noticed that the defendant, a white male, was walking away from all of the action. He was shorter and stockier than Flinter, appeared to be sweating profusely, was unkempt, his hair was in a disarray, twigs and leaf debris were on his clothes, and his shoes were muddy. The people in the area continued to point to the defendant as the perpetrator. Hill drew his service revolver, told the defendant to put his hands against the wall, and then placed him under arrest.

We conclude that these facts and circumstances provided reasonable grounds for Hill to believe that the defendant was one of the two persons who had committed the robbery at the bank. The information possessed by Hill reasonably singled out the defendant from all other persons in the area as a perpetrator of the robbery. See *United States* v. *Fisher*, 702 F.2d 372, 375 (2d Cir. 1983). Although the clothing description did not match the clothing that the defendant was wearing, Hill was able to deduce from all of the other evidence, based upon his skill and experience as a member of the street crime division, that there was probable cause to believe that the defendant had committed the robbery. The trial court did not err in concluding that there was probable cause to arrest the defendant. The defendant's motions to dismiss and to suppress were, therefore, properly denied.

## II

The defendant next raises three challenges to the "missing witness" instructions given to the jury. The defendant argues that the trial court erred (1) in giving a missing witness instruction as to Robert Apicella, a longtime friend of the defendant, and as to the defend-

ant's father, on the ground that the requirements for the giving of a *Secondino* instruction were not met, (2) in sua sponte giving a missing witness instruction as to the defendant's father without either party requesting it and without notice, and (3) in allowing the state's attorney to argue, in his rebuttal, a missing witness inference without prior approval from the court. We find no reversible error with respect to these claims.

" 'The failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause.' *Ezzo* v. *Geremiah,* 107 Conn. 670, 677, 142 A. 461 (1928)." *State* v. *Carrione,* 188 Conn. 681, 686, 453 A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983). An unfavorable inference charge is permissible if two conditions are satisfied: "The witness must be available, and he must be a witness whom the party would naturally produce." *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960). The requirement that a witness must be one whom "the party would naturally produce," does not include a witness whose testimony is either relatively unimportant, cumulative, or inferior to testimony already produced at trial. *State* v. *Brown,* 169 Conn. 692, 705, 364 A.2d 186 (1975); 2 J. Wigmore, Evidence (3d Ed.) § 287. "A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." *Secondino* v. *New Haven Gas Co.,* supra, 675. "To charge the jury on the rule, the party claiming the benefit of the rule must show that he is entitled to it." *Doran* v. *Wolk,* 170 Conn. 226, 229, 365 A.2d 1190 (1976).

We first address the adverse inference charge with respect to Apicella. The defense offered the testimony of several witnesses, including the defendant, as evidence that the defendant had been in the area of the bank for a legitimate business reason. The defendant testified that he and Flinter had gone to the housing complex to meet a plumber. The defendant further testified that they drove there in a rented blue Buick automobile and parked the automobile in a parking area located up the Bella Vista driveway entrance at the top of the hill. On cross-examination, the defendant was unable to describe exactly where he had parked the car.

The defense then offered the testimony of Frank Fabbri, who testified that the defendant, subsequent to his arrest, telephoned him and requested that Fabbri come from Torrington to New Haven to pick up a rental car that he had driven to the Bella Vista. Fabbri testified that because he was unfamiliar with the New Haven area he had a friend, Apicella, accompany him to New Haven. Apicella drove Fabbri to the Bella Vista where they located the rental car. Fabbri was unable to recall exactly where they had found the car and on cross-examination stated that Apicella "could probably tell you better than I could" where the car was located. Fabbri stated that he had not paid attention to any location, but had relied on Apicella to locate the car. Fabbri further testified that Apicella was a long-time, good friend of the defendant who resided in Waterbury.

The state presented rebuttal evidence that the rented Buick automobile was not among the cars parked at the Bella Vista visitors parking area nor along the street, and was not a car the license plate numbers of which had been recorded by the police on the day of the robbery. Upon this evidentiary foundation, the state

requested, and the court gave, a missing witness instruction regarding the defendant's failure to call Robert Apicella.

On appeal, the defendant does not claim that Apicella was not available. He claims, rather, that the second *Secondino* requirement, namely, that the state must show that Apicella is a person whom the defendant would naturally produce, was not satisfied because (1) Apicella's testimony would have been cumulative to that offered by Fabbri, and (2) he was equally available to the state as a witness.

We disagree with the defendant's assertion that Apicella's testimony would have been merely cumulative. "The testimony of an additional witness upon a significant disputed issue can hardly be characterized as cumulative. *State* v. *Reid,* 193 Conn. 646, 662, 480 A.2d 463 (1984)." *State* v. *Ruiz,* 202 Conn. 316, 325, 521 A.2d 1025 (1987). Apicella's testimony was significant because it presumably would have supported the defendant's claim that he was at the Bella Vista for a legitimate business reason.

The defense centered around the defendant's legitimate business reason for being at the Bella Vista. The existence of the rental car was a matter raised by the defendant to support his explanation of his presence at the Bella Vista. The state, on the other hand, contended that the defendant had arrived at the scene in the getaway car. Because there was testimony of prosecution witnesses that the two robbers had a getaway car parked in front of the bank with the engine running, the existence of the rental car was crucial to the defense. Therefore, Apicella's testimony about the existence of and location of the rental car would have, if credible, strengthened the defendant's case. If the jury believed that the defendant had his own transportation to the Bella Vista, then his entire defense was made

more credible. Apicella's recollection of where the rental car was located was allegedly superior to that of Fabbri. The failure to call Apicella to corroborate Fabbri's testimony was proper to call to the jury's attention.

We also reject the defendant's argument that the opportunity of the state to call Apicella as a witness negates the view of the trial court that Apicella was a witness that the defendant would naturally produce. "Though each party ordinarily is empowered to place an available witness on the stand, such a witness often may be expected to furnish testimony more favorable to one side than the other." *State* v. *Ruiz,* supra, 325, citing *State* v. *Reid,* supra, 662–63, and *Russell* v. *Dean Witter Reynolds, Inc.,* 200 Conn. 172, 191, 510 A.2d 972 (1986).

The trial court did not err in giving a *Secondino* instruction as to Apicella. Because of our disposition of this issue, any error with regard to the prosecution's reference to Apicella as a missing witness is rendered harmless and we therefore need not discuss that issue further.

We next address the adverse inference charge with respect to the defendant's father. The trial court sua sponte gave a missing witness instruction permitting the jury to draw an adverse inference from the defendant's failure to call his father. The court combined this charge with the missing witness charge on Apicella. A review of the transcript reveals that although the defendant excepted to the charge, he only proffered grounds for this exception with regard to Apicella. The defendant failed to make a proper exception to the charge. See Practice Book § 288. There is no plain error; see Practice Book § 4185; nor is the *Evans* bypass rule applicable. See *State* v. *Evans,* 165 Conn. 61, 69–70, 327 A.2d 576 (1975). We decline to review the defendant's claim further.

## III

The defendant's third claim is that the trial court erred in prohibiting the defendant from being present in the courtroom during the court's voir dire of the individual jurors concerning jury tampering and in denying the defendant's subsequent motion for a mistrial. The defendant claims that his exclusion from the voir dire proceeding violated his right to be present under the confrontation clause of the sixth amendment to the United States constitution and his right to a fair trial under the due process clause of the fourteenth amendment to the federal constitution. He also claims that his exclusion from the voir dire proceeding violated his right to be present under Practice Book § 967.[3] We address the merits of the defendant's constitutional claims which were raised below but we decline to address the merits of the alleged violation of the rules of practice since that claim was not made in the trial court. Practice Book § 4185; see, e.g., *State* v. *Miller*, 186 Conn. 654, 672, 443 A.2d 906 (1982); *State* v. *Devanney*, 12 Conn. App. 288, 290–91, 530 A.2d 650 (1987).

After a weekend recess and prior to the resumption of the defendant's presentation of his case, it was brought to the attention of the court that over the weekend one or more of the jurors had received anonymous telephone calls concerning the case. The court informed the prosecutor and defense counsel in chambers about the situation. The parties and the court agreed to conduct an individual voir dire of each juror to determine

---

[3] Practice Book § 967 provides in pertinent part: "The defendant has the right to be present at the arraignment, at the time of the plea, at evidentiary hearings, at the trial, and at the sentencing hearing, except as provided in Sec. 966. Whenever present, the defendant shall be seated where he can effectively consult with his counsel and can see and hear the proceedings."

exactly what had happened. The court preferred to conduct an in-chambers voir dire; see, e.g., *State* v. *Sims*, 12 Conn. App. 239, 241, 530 A.2d 1069 (1987); but defense counsel requested a public proceeding, which the trial court granted.

Counsel also requested that the defendant be allowed to be present at the voir dire proceeding to avoid any possible prejudice that might result on account of his absence from the proceeding. The trial court denied the defendant's request, explaining: "I don't think that he should be present and I don't want any possibility of coercion or intimidation. And I'm not saying that your client made those phone calls or [that] he had anybody make them . . . [but] under the circumstances I feel [that] these jurors should be questioned without his presence." Thus, during the proceeding, which remained open to the public, the state's attorney, assistant state's attorney, and defense counsel were present, but the defendant was excluded.

The court permitted the defendant to remain in an adjacent room where he could listen to the proceedings over a loudspeaker system. The court further ordered the reporter to make a transcript of the entire proceeding for the defendant and his counsel. The trial court examined the jurors individually, and ascertained that three of the six regular jurors and the two alternate jurors had received telephone calls and that all of the jurors had discussed the matter that morning among themselves. The person making the phone calls basically mentioned the named juror called, stated that the state's ballistic test was used in a homicide, and then hung up. The telephone calls were all anonymous and presumably related to the testimony of Marshall Robinson, a Connecticut state trooper, who had testified one week earlier about the testing of a gun found in the area of the bushes located near the bank. Robinson testified before the jury that he had been requested to compare

test bullets from the weapon with bullets in another case. Subsequently, in the absence of the jury, counsel for the defendant conducted a voir dire of Robinson concerning the testing of that gun. Robinson stated on the record that he had test-fired the gun for a homicide that had taken place in 1980. The fact that the other case was a homicide was never mentioned to the jury.

Upon questioning by the court, each juror affirmatively testified that neither the phone calls nor the jury's discussion about them would in any way influence his or her decision. The jurors themselves characterized the subject matter of the phone calls as "totally unrelated" to this case, "didn't make any sense," and "didn't seem to have any point to it."

The trial court offered to give a cautionary instruction to the jury to disregard the defendant's absence. Although the state had no objection, the defendant expressly requested that such an instruction not be given to the jury. The trial court denied the defendant's motion for a mistrial because it concluded that the voir dire revealed no basis for any doubt that all of the jurors maintained the ability to remain impartial. On appeal, the defendant claims error in his exclusion from the voir dire proceeding, arguing that it was a critical stage of trial and a deprivation of his constitutional rights to be present. He claims that his absence could have suggested to the jury that he had something to do with the attempted tampering caused by the anonymous phone calls.

A

We first examine the defendant's constitutional claim with reference to the right to be present under the confrontation clause of the sixth amendment to the federal constitution. The sixth amendment provides in pertinent part: "In all criminal prosecutions, the

accused shall enjoy the right . . . to be confronted with the witnesses against him." This right extends to defendants in state as well as federal criminal proceedings. *Pointer* v. *Texas,* 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

During the voir dire proceeding, the court asked all jurors (1) whether they received a phone call, (2) whether they discussed the phone calls with other members of the jury, (3) what was the content of the phone calls, and (4) whether they could remain impartial or whether the phone calls would influence their decision in any way. These questions specifically addressed the competency of the jurors to remain impartial. Where, as here, the proceeding did not involve examination of witnesses or the presentation of evidence against the defendant, such as testimony of a witness on an issue at trial, the defendant's rights under the confrontation clause were not violated by his exclusion. *Kentucky* v. *Stincer,* 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987); *United States* v. *Gagnon,* 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985); *Snyder* v. *Massachusetts,* 291 U.S. 97, 105–106, 108, 54 S. Ct. 330, 78 L. Ed. 674 (1934).

## B

The United States Supreme Court has also recognized a defendant's right, under the due process clause of the fourteenth amendment to the federal constitution, "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder* v. *Massachusetts,* supra, 105–106. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." Id., 107–108; see also *Faretta* v. *California,* 422 U.S. 806, 819 n.15, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

"Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky* v. *Stincer, supra,* 745.

The voir dire of the jurors concerning possible jury tampering was a critical stage of the criminal proceeding. The only question that we must resolve, then, is whether the defendant's presence would have contributed to the fairness of the procedure. "The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication. *Rushen* v. *Spain,* 464 U.S. 114, 125–26, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983) (*Stevens, J.,* concurring in judgment)." *United States* v. *Gagnon, supra,* 526. As the court cautioned in *Snyder* v. *Massachusetts, supra,* 115, however, the exclusion of a defendant from a proceeding should be considered in light of the whole record. In this case, the trial had already been in progress for several weeks and the defendant had at all times been present. In fact, the defendant had been actively assisting his counsel and participating in the defense. The exclusion of the defendant at a time when the court was inquiring about jury tampering, could have called the attention of the jurors to the defendant's absence.

Moreover, the Supreme Court has emphasized that for the purposes of procedural due process a defendant's presence is required in proceedings concerning jury tampering. The trial court "should determine the circumstances, the impact . . . upon the juror, and whether or not it was prejudicial, *in a hearing with all interested parties* . . . ." (Emphasis added.) *Remmer* v. *United States,* 347 U.S. 227, 229–30, 74 S. Ct. 450, 98 L. Ed. 654 (1954); see also *Smith* v. *Phillips,* 455 U.S. 209, 216–17, 217 n.7, 102 S. Ct. 940, 71 L. Ed.

2d 78 (1982) (defendant's presence required in a "*Remmer*-type" hearing); cf. *Rushen* v. *Spain,* supra, 126–27 (Stevens, J., concurring) (defendant has a right to be present incident to his right to a hearing in cases of jury tampering).

The mid-trial voir dire proceeding bore a substantial relationship to the defendant's ability to defend himself because the line of questioning pursued by the court centered on the ability of each individual juror to remain impartial throughout the trial and then to render a verdict based solely on the evidence presented at trial. The questions were directly related to each juror's ability to render a verdict untainted by the fact of the telephone calls. The exclusion of the defendant from the courtroom violated his right to be present under the due process clause of the fourteenth amendment. It is necessary, therefore, to undertake a harmless error analysis. We do so because the defendant concedes that a harmless error analysis applies in a situation where a defendant is excluded from a critical stage of the proceedings in which his presence would contribute to the fairness of the proceeding. We therefore, need not decide whether the fourteenth amendment right to be present under the due process clause is so central to the requirement of a fair trial that its violation per se requires that the conviction from which it arose be set aside.[4] See, e.g., *Kentucky* v. *Stincer,* supra, 747 n.21.

---

[4] The right to be present at all stages of a criminal trial, "may be waived by the defendant's voluntary and deliberate absence from the trial without good cause, or by his conduct or misconduct. *Illinois* v. *Allen,* [397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)]; *State* v. *Parham,* 174 Conn. 500, 505, 391 A.2d 148 (1978); *Talton* v. *Warden,* 171 Conn. 378, 384, 370 A.2d 965 (1976)." *State* v. *Giorgio,* 2 Conn. App. 204, 206–207, 477 A.2d 134 (1984). Also, in *Remmer* v. *United States,* 347 U.S. 227, 229–30, 74 S. Ct. 450, 98 L. Ed. 654 (1954), the Supreme Court stated: "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Govern-

The record establishes that defense counsel was present to safeguard the defendant's interests; see *Mann* v. *Dugger,* 817 F.2d 1471, 1476 (11th Cir. 1987); *United States* v. *Stratton,* 649 F.2d 1066, 1080–81 (5th Cir. 1981) (attorney's presence relevant to the harmless error analysis); the defendant listened to the examination of the individual jurors; the trial court ordered transcripts of the proceeding to be given to the parties; and the court permitted the defendant and his counsel to confer about the matter. Furthermore, the defendant expressly refused any instruction by the court to the jury that the jury disregard his absence. Most important, the transcript of the voir dire establishes each juror's ability to remain impartial. Defense counsel acknowledged at trial that the juror's responses were straightforward. The defendant's claim is, in essence, that his absence from the courtroom could lead to an inference by the jury that he had prompted or made the phone calls. Because the content of the calls was not in the defendant's interest, the jury could not reasonably have made such an inference. Furthermore, the responses of the jurors indicate that they were confused as to the purpose of the calls, characterizing them as "totally unrelated," "didn't make any sense," and "didn't have any point."

The state has met its burden of proving harmlessness beyond a reasonable doubt;[5] *Chapman* v. *California,* 386 U.S. 18, 23–24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *State* v. *Cohane,* 193 Conn. 474, 484–85,

---

ment to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. *Mattox* v. *United States,* 146 U.S. 140, 148–50 [13 S. Ct. 50, 36 L. Ed. 917 (1892)]; *Wheaton* v. *United States,* 133 F.2d 522, 527 [1943]."

[5] Where the trial court's error *does not implicate constitutional protections,* the burden of establishing harm sufficient to warrant a reversal rests with the defendant appellant. *State* v. *Brown,* 187 Conn. 602, 611, 447 A.2d 734 (1982); *State* v. *Truppi,* 182 Conn. 449, 465, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981).

479 A.2d 763, cert denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); and, therefore, the defendant's exclusion from the voir dire proceeding was not reversible error.

## IV

In his fourth claim of error, the defendant argues that the trial court erred in denying his motions for a mistrial based on the prejudicial nature of certain testimony of two state's witnesses. Robinson testified that a gun in evidence in this case was also test-fired and compared to bullets in another case. Deborah Baughn, a criminalist from the state forensic laboratory, testified as to the existence of a red stain on pants worn by Flinter, an alleged accomplice, and seized at the time of arrest. We find no reversible error.

## A

The state presented the testimony of Robinson, a firearms expert, who examined two guns retrieved from the bushes, and three cartridges found in the road. After the witness identified the weapons and cartridges from the state's exhibits, the prosecutor asked: "And what did you do, first of all, with the weapons?" Robinson replied: "The Walther, state's exhibit WW, was test-fired on an earlier date than the Smith and Wesson because I was requested to compare test bullets from it to evidence in a different case. Then in December I examined and test-fired the Smith and Wesson pistol with the intent to compare the test bullets and cartridge cases to test bullets and cartridges submitted in this case."

The defendant did not object to this testimony but subsequently requested a mistrial on the ground that the testimony was prejudicial in that the jury could speculate that the gun was used in another case. Although the trial court denied the defendant's motion,

it did allow defense counsel to voir dire the witness concerning the test-firing. Upon examination, Robinson revealed that the Walther gun had been test-fired to compare with bullets in a homicide case, which proved negative. The court offered to give a curative instruction to the jury so that it would know that the gun was not involved in another criminal matter. The defendant expressly requested that the court not so instruct the jury and the court acquiesced.

"The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been deprived of the opportunity for a fair trial." *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); Practice Book § 887.[6] The ultimate question on a motion for mistrial is whether the alleged offense resulted in " 'substantial and irreparable prejudice to the defendant's case.' " *State* v. *Jennings,* 5 Conn. App. 500, 505, 500 A.2d 571 (1985), quoting the standard set forth in Practice Book § 887. A motion for a mistrial is directed to the trial court's "broad discretion." *State* v. *DeMatteo,* 186 Conn. 696, 704, 443 A.2d 915 (1982).

The testimony concerning the test-firing of the gun was not relevant or probative of any issue before the jury. If improper evidence has " 'a tendency to excite the passions, awaken the sympathy, or influence the judgment of the jury,' " it is prejudicial to the defendant. *State* v. *Ferraro,* 160 Conn. 42, 45, 273 A.2d 694 (1970), quoting *State* v. *Loughlin,* 149 Conn. 21, 26, 175

---

[6] Practice Book § 887 provides in pertinent part: "FOR PREJUDICE TO DEFENDANT

"Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the proceedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case."

A.2d 367 (1961). In *Ferraro,* a state's witness testified that a detective found pistols, ammunition and a ski mask in the defendant's apartment, evidence which was later determined by the court to have no connection to the case being tried. The court failed to give a curative instruction even though the defendant had requested that one be given. On appeal, a new trial was ordered because the evidence could not be considered harmless: "At the very least the jury could have believed that these defendants were violent individuals. The inflammatory nature of the testimony may well have affected the jury's judgment. In addition to being highly inflammatory, the retention of the testimony in the record, and the refusal to instruct the jury to disregard it, combined to permit the jury to indulge in guess, surmise and speculation." *State* v. *Ferraro,* 45–46.

The testimony in the present case, however, is not unduly prejudicial. It had no tendency to excite the passions or awaken the sympathy of the jury. Nor did it have any tendency to influence the judgment of the jury.

Second, the gun was already in evidence. This is not a case where prejudicial physical evidence was admitted. See, e.g., *State* v. *Girolamo,* 197 Conn. 201, 207, 496 A.2d 948 (1985); *State* v. *Onofrio,* 179 Conn. 23, 31, 425 A.2d 560 (1979); *State* v. *Acklin,* 171 Conn. 105, 115, 368 A.2d 212 (1976). Third, the testimony did not directly connect the defendant to the gun or to the unrelated crime for which the gun was test-fired. The challenged testimony was merely one statement in a lengthy trial.

Finally, and most important, the defendant declined a cautionary instruction on the matter. The trial court could have decided that the testimony, even if prejudicial enough to warrant an instruction, did not call for

a mistrial. Defense counsel cannot opt for a mistrial instead of a curative instruction, as if the two were interchangeable. "If defense counsel decides to move for mistrial and altogether eschews the instruction, the trial court cannot be compelled by that decision to go further than it otherwise would." *State* v. *Hawthorne,* 176 Conn. 367, 374, 407 A.2d 1001 (1978); see also *State* v. *Maldonado,* 193 Conn. 350, 357–58, 478 A.2d 581 (1984); *State* v. *Rado,* 172 Conn. 74, 81, 372 A.2d 159 (1976) (prejudice to defendant could have been remedied by court's striking of the improper testimony and instructing the jury to disregard it and, therefore, trial court did not abuse its discretion in denying motion for mistrial).

The court concluded that, under the circumstances, the testimony of Robinson did not warrant the extreme remedy of a mistrial. We agree with the trial court's determination that the testimony did not deprive the defendant of a fair trial. We find nothing in the record to indicate that the court was wrong in its conclusion, or that those remarks in any way contributed to the verdict. We hold, therefore, that the court did not abuse its discretion in denying the defendant's motion for a mistrial.

B

The defendant next claims that the trial court erred in denying his motion for mistrial which he based on Baughn's testimony on cross-examination. Specifically, the defendant claims that the trial court erred in allowing her testimony as to the existence of a red stain on Flinter's pants which were seized at the time of arrest, because the state failed to disclose that finding pursuant to discovery orders.

Prior to trial, Baughn, examined the pants and sweater worn by Flinter at the time he was taken into

custody. Pursuant to Practice Book § 741 (6),[7] the defendant filed a motion for discovery seeking the disclosure of all the reports and findings of expert witnesses in the case, which motion was granted. In compliance with that discovery order, the state disclosed two reports prepared by Baughn. The reports made no finding of red stains on the pants and stated that "[n]o red dye residue was observed" on the pants. The defendant's own four experts had access to the state's evidence, including the pants, which they photographed and examined.

On direct examination at trial, Baughn testified as to the chemical properties of the red dye used in the exploding bait-money packets from the bank. She also testified as to a comparison of those chemical properties with red stains that were found on several clothing exhibits. Out of the presence of the jury, the trial court sustained the defendant's objection to the state's proffer of evidence of the testing performed on Flinter's sweater and pants. Thus, on direct examination, Baughn did not testify as to any testing of those articles of clothing. On cross-examination, however, defense counsel referred to Baughn's written reports and questioned her about the pants seized from Flinter: "And with regards to that other pair of pants, you also found no red stains, is that correct?" The witness replied: "The other pair of pants that we got in the laboratory, there were red stains on them but after testing them there we could not get enough off the pants to get a positive result."

---

[7] Practice Book § 741 (6) requires the state, upon written motion by the defendant, to disclose "[c]opies of results or reports of scientific tests, experiments or comparisons made in connection with the particular case which is known to and obtainable by the prosecuting authority and within the possession, custody, or control of any governmental agency, and which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial . . . ."

The defendant moved for a mistrial on the ground that Baughn's written reports did not indicate the presence of red stain on Flinter's pants, and that her testimony was prejudicial to the defendant. The trial court denied the motion and noted that the defendant had raised the issue of testing Flinter's pants. The question before us, once again, is whether the trial court abused its discretion in denying the motion for mistrial.

The United States Supreme Court has made clear that "there is no general right to discovery in a criminal case."[8] *Weatherford* v. *Bursey,* 429 U.S. 545, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977). "In the absence of a statute or court rule to the contrary, a person accused of a crime is not, as a matter of right, entitled to inspection or disclosure of evidence in the possession of the prosecution." *State* v. *Festo,* 181 Conn. 254, 263, 435 A.2d 38 (1980). The trial court, pursuant to Practice Book § 741 (6), ordered the state to disclose copies of the "results or reports of scientific tests, experiments or comparisons made in connection with the particular case." The state complied with this order when it turned over to the defendant the two written reports prepared by Baughn. Practice Book § 741 (6) does not require the state to disclose a physical description of an item subjected to testing, nor must it disclose details of the testing procedure.

" 'The purpose of criminal discovery is to prevent surprise and to afford the parties a reasonable opportu-

[8] Under the rule announced in *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), however, the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." Id., 87; see also *State* v. *Grayton,* 163 Conn. 104, 108, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495 (1972). The defendant in this case does not claim that the testimony of Baughn concerning a red stain on Flinter's pants is in any way exculpatory. In fact, the parties appear to be in agreement that this evidence could only be considered as inculpatory. Thus, the *Brady* doctrine is inapplicable to this case. See, e.g., *State* v. *Festo,* 181 Conn. 254, 263 n.4, 435 A.2d 38 (1980).

nity to prepare for trial.' *State* v. *Festo,* supra, 265.'' *State* v. *Cosgrove,* 186 Conn. 476, 489, 442 A.2d 1320 (1982). From the reports, the defendant was aware that Flinter's pants had been tested and that no "red dye" had been found on them. By his objection, the defendant kept that specific information from the jury during Baughn's direct testimony. On cross-examination, apparently deciding to pursue that issue, defense counsel went outside the findings of Baughn's report and inquired as to whether the pants contained any "red stain," a condition not addressed by the report. The defendant's expert witnesses had access to the pants themselves prior to trial. When defense counsel was asked at oral argument in this court whether he saw a red stain on the pants, he replied that he would have to say that he "saw something." Under these circumstances, the defendant can hardly claim surprise. See, e.g., *State* v. *Summerville,* 13 Conn. App. 175, 183, 535 A.2d 818 (1988). We hold that the trial court properly denied the defendant's motion for a mistrial.

V

In his fifth claim of error, the defendant argues that the trial court erred in denying his motion to suppress identification testimony, and in allowing into evidence identification testimony which had been tainted by a prior suggestive show-up.

Prior to trial, the defendant had filed a motion to suppress identification testimony on the ground that it was tainted by an impermissibly suggestive show-up of the defendant. This motion was continued to the time of trial. At trial, the state did not offer any evidence of the pretrial identification. Instead, it offered the bank tellers' testimony about their observations of the robbers during the commission of the crime. The record reveals that immediately after the robbers exited the bank, the tellers, in accordance with bank procedure,

made written notes of their observations to aid in later identification. These notes, together with the tellers' written statements made to the police, were turned over to the defendant during the trial. Thus, although no visual in-court identification of the defendant was made at trial, several eyewitnesses testified as to the perpetrators' race, sex, height, weight, body build and clothing.

During the cross-examination of one of the bank tellers, the defendant renewed his motion to suppress[9] and made motions to strike and for a mistrial. The trial court allowed the defendant to make an offer of proof and to voir dire the witness outside the presence of the jury. The court then denied these motions on the ground that the state had not elicited àny testimony of the show-up procedure and because the witness had not made a visual in-court identification of the defendant.

Our review of the record, transcripts, and appellate briefs in this case reveals that there was no testimony about the show-up procedure used and that no visual in-court identification of the defendant was made by the state's witnesses. The record merely reveals that the testimony of bank tellers described the robbers according to each *witness' recollection of what had occurred at the time of the robbery*. As the defendant accurately stated at oral argument, none of the witnesses visually identified the defendant in the courtroom as being the same individual who robbed the bank, or as exhibiting the same or similar characteristics as

---

[9] At some point during the trial, the defendant, in an apparently spontaneous utterance, spoke out loud in the courtroom. One of the state's witnesses, a teller at the bank, based on that courtroom utterance, made a voice identification of the defendant on redirect examination. This in-court voice identification is not at issue on appeal.

one of the robbers was described as possessing. See also *State* v. *Graham,* 13 Conn. App. 554, 561–62, 538 A.2d 236 (1988).

Contrary to the defendant's belief, this case is not one where an in-court identification is challenged on the ground that it was tainted by an impermissible out-of-court identification procedure. See *State* v. *Mitchell,* 204 Conn. 187, 200, 527 A.2d 1168, cert. denied, U.S. , 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987); *State* v. *Parker,* 197 Conn. 595, 597, 500 A.2d 551 (1985). There is simply no in-court identification to suppress in this case. Because there was no visual in-court identification, any suggestiveness of the show-up procedure and out-of-court identification is not at issue. Accordingly, the trial court did not err in denying the defendant's motions to suppress, to strike, and for mistrial.

## VI

The defendant's final claims of error concern the eighty year effective sentence imposed by the trial court. The defendant claims that one trial court, *Quinn, J.,* erred in imposing sentence in an illegal manner, and that another trial court, *Kinney, J.,* erred in refusing to hear the merits of his motion to vacate the sentence. We conclude that the trial court did not impose the defendant's sentence in an illegal manner and, therefore, we do not need to address the defendant's claim with respect to his motion to vacate his sentence.[10]

The defendant does not argue, nor could he, that the trial court imposed an illegal sentence. An "illegal sentence" is essentially one which either exceeds the rele-

[10] After sentencing, the defendant made a motion to vacate the sentence pursuant to Practice Book § 935, which provides that a court "may at any time correct an illegal sentence . . . or it may correct a sentence imposed in an illegal manner . . . . " That motion was based on exactly the same grounds as are now before this court on appeal.

vant statutory maximum limits, violates a defendant's right against double jeopardy, is ambiguous, or is internally contradictory. See 8A J. Moore, Federal Practice, para. 35.03[2], pp. 35-35 through 35-36. The sentence imposed upon each count is within the statutory limits set forth in General Statutes § 53a-35a (4).

The defendant does argue, however, that his sentence was imposed in an "illegal manner." Sentences imposed in an illegal manner have been defined as being "within the relevant statutory limits but . . . imposed in a way which violates defendant's right . . . to be addressed personally at sentencing and to speak in mitigation of punishment . . . or his right to be sentenced by a judge relying on accurate information or considerations solely in the record, or his right that the government keep its plea agreement promises . . . ." 8A J. Moore, supra, pp. 35-36 through 35-37.

## A

The defendant raises three specific grounds in support of his claim that the trial court imposed sentence in an illegal manner. The defendant's first ground is that the trial court, subsequent to the jury's verdict but prior to the sentencing, visited the scene of the crime without giving notice to the defendant or to defense counsel. He argues, as a result, that his constitutional right to due process of law was violated because the court's failure to give notice to him of its visit afforded him with no opportunity to challenge or to rebut the conclusions and inferences drawn by the court during its ex parte investigation of the crime scene.

At the sentencing hearing, the trial court stated: "It just seems to me that the evidence that was presented in this case was overwhelming. There was no question in my mind that the evidence that was put on by Mr. McNellis in his own defense was something that he dreamed up . . . . I think that whole story that he

presented to this jury was as wild a story as I ever heard. To show you my concern for it I did go out to the location after the trial was all over, and I went over the route that his witnesses said they went on. I observed from the points where his witnesses said they observed. There was no way that any of their story could ring true with what they testified to and the actual site itself."

We begin our analysis with the principle that "a sentence imposed . . . within statutory limits, is generally not subject to review." *United States* v. *Tucker,* 404 U.S. 443, 447, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972). It has long been the practice in this state to permit the sentencing court to exercise a wide discretion as to the sources and types of information used to assist it in determining the sentence to be imposed within the limits fixed by law. *State* v. *Huey,* 199 Conn. 121, 127, 505 A.2d 1242 (1986). Such practice facilitates the penal philosophy that sentences ought to be individualized to fit not only the crime but also the criminal. *United States* v. *Grayson,* 438 U.S. 41, 48, 98 S. Ct. 2610, 57 L. Ed. 2d 582 (1978). "[B]efore making a [sentencing] determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States* v. *Tucker,* supra, 446.

Consideration of many sources of information is possible because " 'due process does not require that information considered by the trial judge prior to sentencing meet the same high procedural standard as evidence introduced at trial.' " *State* v. *Huey,* supra, 127, quoting *United States* v. *Robelo,* 596 F.2d 868, 870 (9th Cir. 1979).

The defendant claims that it was error for the trial court to rely on such information at sentencing when

it failed to give notice to the defendant of its ex parte investigation of the crime scene, thereby violating his federal constitutional right to procedural due process. We know of no case, nor has either party cited any authority, which would serve as guidance in deciding this issue.

This is not a case where the court engaged in an ex parte communication, or denied the defendant the right to challenge statements in a report of a presentence investigation. That right is insured by our practice of giving the defendant a copy of such report in advance of the sentencing hearing so that he may controvert or explain the facts reported therein. See, e.g., *State v. Harmon*, 147 Conn. 125, 129, 157 A.2d 594 (1960); see also American Bar Association Standards for Sentencing Alternatives and Procedures § 18-6.9, Judicial Restraint, and Comment thereto. This case, rather, involves an ex parte and solo view of a crime site.

The trial court, in its remarks at sentencing, stated that it did not believe the defendant's defense. The court also told the defendant that it went to the site of the crime "to show you my concern," and concluded that the testimony of the defendant and his witnesses did not "ring true" based on the court's observation of the site. The court, therefore, in essence, told the defendant that the purpose of its view was for the benefit of the defendant. The remarks of the court indicate that its view of the scene reinforced the court's belief that the jury's guilty verdict was correct. The viewing, therefore, did not add or detract anything from what the trial court believed the evidence to show about the defendant's guilt. There is no indication from the court's remarks that the visit to the crime scene in any way affected the term of the sentence imposed upon the defendant. The failure to give notice that the court would visit the scene was not tantamount to a violation of due process of law in this case because we con-

clude that the trial court did not rely on such information to enhance the defendant's sentence. Therefore, we cannot hold that the sentence was imposed in an illegal manner.[11]

## B

The second ground the defendant raises in support of his claim that his sentence was illegally imposed is his contention that the sentencing court enhanced his sentence on the basis of false information of past criminal conduct. The defendant contends that "[t]he court here placed great emphasis on its belief that Mr. McNellis had committed an assault and was not properly punished for it and enhanced his sentence because of it." The defendant claims that although he was convicted and sentenced in 1969 for carrying a dangerous weapon, he had not assaulted anyone in connection with that offense, but that the sentencing court had the false belief that he had assaulted someone in 1969.[12]

When a defendant is actually prejudiced by the prosecution's submission of misinformation regarding his prior criminal record, or by the court's careless misreading of that record, a defendant is denied due process of law and the conviction cannot be sustained.

[11] We are aware that the scene of a crime, particularly an outdoor scene covering a fairly large area, is not immutable. Landmarks, such as rocks, bushes and trees, extant at the time of the crime, may no longer be present at a subsequent viewing of the scene. The contours of the land itself may also be different. It would, therefore, under ordinary circumstances, be advisable that a trial court not conduct, ex parte, its own investigation of a crime scene. See *Decko* v. *Wood,* 6 Conn. App. 95, 96–97, 503 A.2d 185, cert. denied, 199 Conn. 801, 505 A.2d 1249 (1986).

[12] At the sentencing hearing, the court stated: "The man is not fit to walk the street. There's no question. I read one of these [police] reports, and I couldn't get over it, I was amazed. He was arrested on a charge of assault where he got out of a car with chains and beat some poor guy who happened to be there, beat him with chains. He pleaded guilty to carrying a dangerous weapon. He should have gone to prison for twenty years at that time."

*Townsend* v. *Burke,* 334 U.S. 736, 740–41, 68 S. Ct. 1252, 92 L. Ed. 1690 (1948). A sentence premised on a materially untrue criminal background of the defendant would be constitutionally infirm. In this case, however, we cannot know the actual facts of the defendant's criminal involvement.

The record on appeal is inadequate to allow this court to decide whether the sentence was imposed in an illegal manner. We have examined the trial court file, the record on appeal, the transcripts, and all appellate briefs. Our inquiry reveals that the defendant has failed to supply us with (1) a copy of the presentence investigation report which allegedly contains the police report concerning the defendant's arrest in 1969, (2) a copy of the motion to vacate illegal sentence,[13] (3) a transcript of the imposition of sentence for the 1969 offense wherein the prosecuting authority allegedly states that "there was no assault by Mr. McNellis," and (4) a clear statement of the facts relevant to this issue. We are unclear as to whether the defendant is claiming that an inaccurate report of the 1969 assault incident was before the sentencing court[14] or whether the sentencing court received accurate police reports but carelessly misinterpreted them in coming to the erroneous belief that the defendant had committed the assault.

This court cannot respond to claims based on allegations extraneous to the formal record; *Accurate Forging Corporation* v. *UAW Local No. 1017,* 189 Conn. 24, 27–28, 453 A.2d 769 (1983); *Chaplin* v. *Balkus,* 189

---

[13] A transcript of the hearing on the motion to vacate the sentence is filed with this court.

[14] It is clear from a reading of the sentencing transcript that the defendant and his counsel received in advance a copy of the presentence investigation report. No objection was made as to any statement in it concerning the 1969 incident. Our rules provide that defense counsel should bring to the court's attention "any inaccuracy in the presentence report of which he is aware or which the defendant claims to exist." Practice Book § 925.

Conn. 445, 448, 456 A.2d 286 (1983); nor to facts which have not been found and which are not admitted in the pleadings, or to documents or exhibits which are not part of the record. See *Gould* v. *Gould,* 164 Conn. 387, 389, 321 A.2d 443 (1973). "It remains the appellant's responsibility to secure an adequate appellate record, and under normal circumstances we will not remand a case to correct a deficiency the appellant should have remedied. *Kaplan* v. *Kaplan,* 186 Conn. 387, 388 n.1, 441 A.2d 629 (1982)." *Carpenter* v. *Carpenter,* 188 Conn. 736, 739 n.2, 453 A.2d 1151 (1982). The defendant has not given this court sufficient facts pertinent and necessary to resolving this issue. Such failure leaves this court with a factual record which is inadequate for appellate review. See, e.g., *Aetna Life & Casualty* v. *Miscione of Connecticut, Inc.,* 193 Conn. 435, 436, 476 A.2d 577 (1984); *State* v. *Anderson,* 178 Conn. 287, 290–91, 422 A.2d 323 (1979).

## C

The third ground the defendant asserts in support of this claim is that the sentencing court penalized him for exercising certain rights, and therefore the sentence was imposed in an illegal manner. The defendant directs this court's attention to remarks made by the trial court.[15] The remarks, when read in context of the

[15] At the time of trial, the defendant was incarcerated. Defense counsel made motions requesting a daily change of civilian clothes. In its sentencing remarks, the court stated: "[At the start of trial,] I was rather amazed to find out that this is a man accused of all these offenses. But then I started to get an inkling of a man you have here, and right off the bat he started trouble. He wanted a change of clothes every day and that set the tone from there on out. Mr. McNellis was insisting that the jury should not know that he was incarcerated, that he had a constitutional right to a change of clothes every single day no matter what the inconvenience or what the rules were of the prison or of the sheriffs department and in going through all that he finally managed to have a change of clothes every day. How he did it, I don't know. Then he takes the stand and proceeds to tell the jury he is in jail. So all that hullabaloo in the very beginning was just a waste of time. That's what this man is, a waste of time."

entire sentencing hearing, do not show that the court enhanced the defendant's sentence on account of defense counsel's request for a daily change of clothes for the defendant or on account of the defendant's testimony about his incarceration. Rather, the transcript indicates that the sentencing court referred to the defendant's conduct and demeanor during the trial. A sentencing court may legitimately consider the evidence heard at trial, as well as the conduct and demeanor of the accused. *United States* v. *Grayson,* supra, 50; *Chaffin* v. *Stynchcombe,* 412 U.S. 17, 22, 93 S. Ct. 1977, 36 L. Ed. 2d 714 (1973). The trial court did not rely on considerations not in the record. See 8A J. Moore, supra, pp. 35-36 through 35-37. We hold, accordingly, that the court did not impose the defendant's sentence in an illegal manner.

There is no error.

In this opinion the other judges concurred.

