## STATE OF CONNECTICUT *v.* MIGUEL ZAPATA
## (AC 30426)

DiPentima, Lavine and Freedman, Js.

---

Argued September 11, 2009—officially released March 9, 2010

*Lauren Weisfeld,* senior assistant public defender, for the appellant (defendant).

*C. Robert Satti, Jr.,* supervisory assistant state's attorney, with whom, on the brief, were *John C. Smriga,* state's attorney, and *Jonathan C. Benedict,* former state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. This case concerns the right of a defendant to be present during an in-chambers hearing concerning possible juror exposure to information about the case other than evidence presented in the courtroom. The issues presented are whether the in-chambers hearing was a critical stage of the proceedings and, if so, whether the defendant's absence was structural error requiring reversal of his conviction. We conclude that the defendant, Miguel Zapata, was denied his state and federal constitutional rights to be present

when the court excluded him from the in-chambers hearing. We conclude, however, that the court's error did not constitute structural error and was harmless beyond a reasonable doubt. We, therefore, affirm the judgment of the trial court.

The defendant appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder with a firearm in violation of General Statutes §§ 53a-48 and 53-202k, murder with a firearm in violation of General Statutes §§ 53a-54a (a) and 53-202k, and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that the court, *Hauser, J.,* (1) denied him his state and federal constitutional rights to (a) due process, (b) counsel and (c) the presumption of innocence by excluding him from an in-chambers inquiry into possible juror partiality; (2) erred by retaining a certain juror (a) whose sibling's telephone number appeared several days before the murder on a cellular telephone police recovered at the scene of the victim's death, (b) who allegedly violated the court's instructions by discussing the case with the sibling and (c) who allegedly was alerted by the court's inquiry to prejudicial information about the defendant; (3) erred by failing to conduct a more thorough inquiry into the juror's discussion with the sibling; and (4) erroneously charged the jury as to reasonable doubt.

The jury reasonably could have found the following facts. On April 26, 2006, the defendant was arrested in Tennessee in connection with the 2001 murder of the victim, Zoltan Kiss. The victim was found dead in the early morning hours of September 28, 2001, when police were summoned to the vicinity of 1185 Pembroke Street (Pembroke Street) in Bridgeport to respond to reports of gunfire. At the time, Pembroke Street was known as a place for illegal drug transactions. According to the victim's girlfriend, Jennifer Wong, the victim went to

Pembroke Street to purchase ecstasy. When the police arrived, they found the victim's body in a motor vehicle that also was riddled with bullet holes. The police recovered eighteen shell casings, the victim's wallet and a cellular telephone.[1]

While surveying the scene, Thomas Lula, then a sergeant assigned to the Bridgeport police detective bureau, saw a blue jacket on the ground next to a large rock and observed a newspaper dated September 28, 2001, on the stoop of 1185 Pembroke Street.[2] Detective Vincent Ingrassia found an operator's license belonging to Jose Arsenega in the blue jacket. Lula knew that Arsenega was dead and that Luisa Bermudez had been his girlfriend.[3] The police proceeded three blocks away to 39 Caroline Street, Bridgeport, and spoke to Sylvia Bermudez, who told them that Luisa Bermudez, her daughter, lived around the corner at 639 Barnum Avenue (Barnum Avenue residence). The police then went to the Barnum Avenue residence, the home of Marlene Bermudez, Luisa Bermudez' sister.

The police entered the Barnum Avenue residence calling for Luisa Bermudez and walked up to the attic where they heard dogs barking. There the police found Luisa Bermudez, Orema Taft, Maritza Gutierrez and the defendant in a makeshift bedroom. Luisa Bermudez answered police questions and accompanied them to the station. Later that day, after securing a search warrant, Lula, Ingrassia and Detective Louis Sam Cortello went to the Barnum Avenue residence where they found

---

[1] The parties have not brought to our attention any evidence regarding where the cellular telephone was found and to whom it belonged, and our reading of the transcript has revealed none. The cellular telephone was not placed into evidence. The parties appear to have assumed that the cellular telephone in question belonged to the victim and that he used it exclusively. We note that the victim's girlfriend, Wong, testified that the motor vehicle in which the victim's body was found belonged to her.

[2] Later, Luisa Bermudez' latent fingerprints were found on the newspaper.

[3] Luisa Bermudez also is the defendant's cousin.

a holster for a large caliber weapon[4] and the victim's jewelry.

The crime went unsolved despite the state's posting a $50,000 reward eight months after the murder and the police periodically canvassing people on Pembroke Street. Some years later, the victim's mother added to the amount of the reward and went door-to-door seeking information, an event reported in the press and on television. Consequently, the reward was known throughout the east side of Bridgeport.

At the time of the murder, Catherine Perez and her three children lived in an apartment at 1185 Pembroke Street. She knew the defendant, having dated him on and off for three years, and knew that he always carried a .357 caliber pistol. Although the defendant also dated Erica Nunez and Gutierrez while he was seeing Perez, Perez denied that the defendant's multiple relationships upset her because she was not serious about her relationship with him. Prior to the murder, Perez saw the defendant and Taft almost every day, and she saw Luisa Bermudez and Gutierrez four or five times a week. She permitted the defendant, Taft, Guiterrez and Luisa Bermudez to keep drugs in her apartment. A staircase at the rear of her apartment led down to an area from which drugs were sold. Perez herself had been arrested for possession of narcotics with intent to sell and received a sentence of probation. Although the police spoke to her on September 28, 2001, to inquire as to whether she knew anything about the shooting, she said "no" because she was afraid of the defendant and his family. Years later, however, Perez contacted the police and gave a statement to Detective Heitor Teixeira. She also testified at trial as follows.

[4] The forensic evidence demonstrated that two semi-automatic pistols were used to shoot the victim, a nine millimeter and a .40 caliber. The victim died from multiple gunshot wounds. The defendant did not have a permit to carry or to possess a firearm.

On September 28, 2001, Perez was getting out of the shower when she heard gunshots and went to her front window overlooking Pembroke Street. She saw the defendant, Luisa Bermudez, Taft and Gutierrez standing around the victim's car. The defendant was shooting a gun. When the shooting stopped, the people standing around the car ran away. As Luisa Bermudez ran, she was looking around Pembroke Street. Perez moved away from her window, as she did not want to be seen. The next day, Sasha Bermudez, a sister of Luisa Bermudez, as well as a cousin of the defendant, came to see Perez. Perez told Sasha Bermudez that she had not seen the shooting. Thereafter, Perez did not see the defendant for more than two weeks. Perez also did not see Gutierrez, Taft and Luisa Bermudez for months after the shooting.

When the defendant eventually visited Perez, he asked her if she had seen the shooting. She told him that she had not. The defendant responded, "don't lie to me, don't lie to me because my family could kill you." Perez was afraid for herself and her children. Perez moved from the apartment at 1185 Pembroke Street to one nearby and later to one in another part of Bridgeport. The defendant, however, visited her at the more distant apartment, where the two argued. Perez claimed that the defendant tried to kill her. She eventually moved out of Bridgeport. Although Perez knew of the reward offered for information leading to the conviction of the victim's murderer, she claimed to have no interest in it.

Marie Vargas, a convicted felon, had grown up on the east side of Bridgeport and knew the defendant, Luisa Bermudez and their family and friends. According to Vargas, the defendant, Luisa Bermudez and their friends routinely sold a variety of drugs from an area behind a tall, locked gate on Pembroke Street, and they routinely carried weapons. In the early hours of

September 28, 2001, Vargas purchased marijuana from a group of people behind the gate, including the defendant, Michael Cooney, Taft and Luisa Bermudez, who was wearing a blue jacket. As Vargas was exiting the gate after making her purchase, she saw the victim, who was wearing a lot of jewelry,[5] get out of a motor vehicle and walk toward the gate. While Vargas was walking toward the intersection of Jane Street and Shelton Street, she heard a commotion behind her. She also heard Luisa Bermudez, who was leaning out a third floor window, shout: "Oh, yeah, we gonna get this right now, we all right, we got it, we got it."

Vargas was on the witness stand when the court excused the jury to hear the arguments of counsel. As the jury was leaving the courtroom, the defendant gestured toward Vargas. Vargas testified to the incident outside the presence of the jury. Vargas stated that the defendant raised his middle finger to her and said she was "a dead bitch."

Cooney, a convicted felon and a cousin of both the defendant and Luisa Bermudez, lived in an apartment overlooking Pembroke Street. On the night in question, he was awakened by the sound of gunfire and looked out his front window. He saw two people firing handguns at a Honda motor vehicle at the corner of Jane Street and Pembroke Street. When the shooting stopped, the men got into a white car and drove away. Cooney told the police who came to investigate that the perpetrators were two dark skinned men, probably Hispanics with "Afros" or something on their heads. At trial, however, Cooney testified that the perpetrators were black and that the defendant was not "dark skinned."

After the defendant had been arrested, Jermaine O'Grinc, an individual charged with numerous crimes,

---

[5] According to Vargas, it was not wise to wear a lot of jewelry in that neighborhood.

gave a statement to the police, hoping that, in return, he would receive favorable treatment from the state. At trial, O'Grinc testified, however, that the statement was not true and that he contrived the statement hoping that the police would leave him alone. O'Grinc's statement was placed in evidence over the objection of defense counsel.[6] According to his statement, O'Grinc met the defendant in a courthouse holding cell where the defendant told O'Grinc that he had shot the victim about fifteen times and that he had "beat the case" due to the lack of evidence. Taft also was in the holding cell and nodded in agreement with the defendant, as he was with the defendant at the time of the shooting. The motive for the shooting was robbery.

Gutierrez, who has two felony convictions, testified pursuant to a subpoena after a capias had issued. Prior to the shooting, Gutierrez had known the defendant and the Bermudez family for several years and had visited Marlene Bermudez and Luisa Bermudez at the Barnum Avenue residence. She sold drugs from the gate at Pembroke Street and had an on-again, off-again sexual relationship with the defendant. On July 2, 2002, Gutierrez gave a written statement to Teixeira in which she stated that she was at the Barnum Avenue residence with the defendant, Taft and Luisa Bermudez at the time of the shooting. In December, 2005, Gutierrez gave Teixeira another statement that was consistent with the testimony she gave at trial,[7] that is, she was present

[6] The court admitted O'Grinc's statement, citing *State* v. *Pierre*, 277 Conn. 42, 78, 890 A.2d 474 (when declarant appears for cross-examination at trial, confrontation clause places no constraints on use of prior testimonial statements), cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); and *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86 (prior written, inconsistent out-of-court statement of declarant, signed by declarant on personal knowledge admissible as substantive evidence when declarant takes witness stand and is available for cross-examination), cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[7] Gutierrez testified that on September 28, 2001, she was sitting on the stoop at 1185 Pembroke Street when the victim arrived. She saw him walk in the gate, exit and quickly get in his car and put it in reverse. The defendant

at the time of the shooting and saw the defendant and Taft shoot the victim. Gutierrez explained that she changed her statement because "[t]his is too hard to deal with. I couldn't take it. I was getting picked up all the time. I had no peace in my life." The police knew that she had been at the scene of the shooting. Moreover, she had not had a decent night's sleep in years; in her head, she could still hear the victim's screams.

The jury found the defendant guilty of all charges. After the court sentenced him to sixty years imprisonment, the defendant appealed.

I

On appeal, the defendant claims that his exclusion from an in-chambers hearing at which the court questioned jurors denied him certain state and federal constitutional rights, specifically the rights (1) to be present, (2) to due process, (3) to counsel and (4) to be presumed innocent. The defendant's constitutional claims present issues of law. See *State* v. *Lopez*, 271 Conn. 724, 731, 859 A.2d 898 (2004). We therefore apply a plenary standard of review. See *State* v. *Gibson*, 270 Conn. 55, 66, 850 A.2d 1040 (2004).

The following procedural history and facts are relevant to the defendant's claims. On July 25, 2006, the defendant filed a lengthy motion for discovery and inspection concerning the state's use of confidential sources and exculpatory evidence. In response to that motion, the state filed a motion for a protective order pursuant to Practice Book (2006) § 40-13 (h) and Practice Book § 40-40. The state asked that it not be ordered to disclose the names and addresses of its witnesses

and Taft pursued the victim and shot him with handguns, while a number of people stood around the car. Gutierrez fled from Pembroke Street with the defendant and Taft to the attic at the Barnum Avenue residence. Before she left Pembroke Street, Gutierrez saw Perez looking out her window.

due to the nature and circumstances of the crime.[8] Both the state and the defendant requested that the court hold an in camera hearing to determine the issue. On September 20, 2006, the court, *Comerford, J.*, following an in-chambers argument, ordered that the names and statements of the state's witnesses be disclosed to defense counsel and consulting investigators but that the information not leave the custody and control of defense counsel. The witnesses' addresses were not to be disclosed. Judge Comerford's order did not concern jurors or prospective jurors.

During jury selection on February 5, 2007, the court instructed the defendant and everyone in the courtroom not to make hand gestures or otherwise attempt to gain the attention of prospective jurors. The court told the defendant, who had been seen gesturing to prospective jurors, that if he made more such gestures, the court would have him removed from the courtroom.

On February 9, 2007, during jury selection, the court again warned the defendant not to "mak[e] . . . recognition or waves or calculations with your hands to the [voir dire] panel members." The court warned the defendant that if he did not follow the court's orders, he would be kept downstairs in the lockup. Later that day, the court stated that it had come to the court's attention that the defendant was continuing to wave to prospective jurors. The court called two courtroom marshals to testify. Judicial Marshal Richard Graczyk testified that he had heard the court warn the defendant several times but that the defendant continued to wave to prospective jurors on the witness stand. Judicial Marshal

---

[8] The state's motion for a protective order stemmed from the hearing in probable cause at which Perez testified that because the defendant knew she had witnessed the victim's shooting, the defendant beat her. Moreover, she knew that the defendant had guns and was capable of doing bad things. When she told the defendant that she had not seen the shooting, he fired a gun causing a bullet to pass by her face. In her statement to the police, Perez stated that she was afraid of the defendant.

James Pelletier testified in a similar manner. After hearing the arguments of counsel, the court ordered that the defendant be placed in handcuffs and recommended that the defendant keep his hands under the counsel table. The court warned the defendant that if he continued to gesture to prospective jurors, the court would reconsider whether it would remove the defendant from the courtroom.

The state began the presentation of its evidence on March 19, 2007. On March 23, 2007, the court started the day by discussing certain procedural matters with counsel, one of which concerned members of the jury.[9] The court stated: "Now, the next issue we have, I believe, is juror number . . . [juror A]. There is a telephone call which—tell me if I'm misstating this, counsel. There is a telephone call on [the victim's] cell phone to someone with the same last name as our juror, and we just want to see whether, number one, they're related. Number two, whether they talked to one another or will be talking to one another, and that they shouldn't be talking to one another because [juror A] shouldn't be talking to anybody. Any difficulty with the court questioning along those lines?"

The prosecutor stated that he had no problem with the court's proposed inquiry but asked that the inquiry be held in camera without the defendant being present due to safety issues and the prosecutor's desire to prevent the disclosure of names and addresses. The prosecutor did not want to reveal the names and addresses of the jurors to the defendant in keeping with Judge Comerford's order. Judge Hauser stated that the court reporter would be present. The court also informed the

[9] On April 4, 2007, Judge Hauser issued an order sealing the names and other identifiable information regarding the jurors. In keeping with that order, we distinguish and refer to the various jurors by letters of the alphabet. See also *State* v. *Newsome*, 238 Conn. 588, 624 n.12, 682 A.2d 972 (1996) (protecting privacy of jurors).

parties that there was another juror who may have been speaking to family members and that the court would inquire of that juror in the same manner. Defense counsel objected to the procedure. In response, the court stated that "this procedure is based on the same concerns that led Judge Comerford to make his discovery orders. And the court feels that [the] defendant's rights are being protected by this procedure."

Defense counsel then elaborated on his objection. "Your Honor, that procedure may well import into the juror's mind an extra level of concern or animosity of why that procedure is taking place, which would then put something else into the mind of the juror other than the facts as they're presented within this courtroom. And the question would be in their mind that may possibly arise, is why is this procedure taking place. . . . I would also add, Your Honor, that this would be a critical phase, or at least a portion of trial that the defendant would have a constitutional right to be present for." Judge Hauser replied that "[t]he transcript will be available to defense counsel, which he can share with the defendant. I'm going to proceed in this manner."

The court asked defense counsel if he wanted the court to give a curative instruction, such as that the juror is "not to consider this as any indication of any guilt or akin type evidence to be considered during any part of the trial, including the deliberations." Defense counsel declined the court's offer of a curative instruction, stating, "[w]ell, I think that poisons the well, so to speak, Your Honor."

In chambers, the court and counsel continued to discuss the inquiry regarding a second juror (juror B) "whose [spouse] related that [juror B] knew the [defendant's] family." Defense counsel stated, "assuming that [the spouse] talked to [juror B] and [juror B] did not stop [the spouse], then [the juror's] already known to

disregard the court's instructions." Moreover, defense counsel argued, if juror B is discussing the case with the spouse, the juror has demonstrated an inability to follow the court's instructions.

The prosecutor elaborated on his request for an in-chambers inquiry: "Just to the extent there has been evidence already, whether believed or not, the defendant threatened to kill one witness in the courtroom, and has threatened to kill another witness without an explanation why. And the concern I have is that because this information of the person that's on the phone call records, which would have an address and a name, I did not want that out in the public courtroom because you would have to mention the name and may have to go into some further information. And that was the purpose of the protective order of Judge Comerford. . . .

"The second issue is [juror B]. And I [have] the concern, that is, did that individual violate the order? But I was concerned that if the order was violated and [juror B] said something that's negative about the accused . . . to the other jurors. But more importantly, in a public forum. And that with the newspaper there and that get[s] into the newspaper, it may not be appropriate."

The court responded, "[w]ell, adding that to the reasons that Judge Comerford made the ruling he made, I think this is a proper way to proceed with it." Defense counsel stated, "I am not waiving my previous objection about my client's right to be present for this hearing."[10] Juror A was then brought into chambers and the court conducted its inquiry.

---

[10] On appeal, as at trial, the defendant does not challenge the court's decision to conduct the inquiry in chambers, only that he was not permitted to be present.

"The Court: Do you know or are you related to [sibling's name]?

"[Juror A]: Yes.

"The Court: What's your relationship?

"[Juror A]: My [sibling].

"The Court: [The person is your sibling?]

"[Juror A]: Yes.

"The Court: Have you talked to [your sibling] about this case?

"[Juror A]: Have I talked [to my sibling]? [My sibling] just asked me, how's it going. I tell [my sibling], it's starting to get juicy and it's getting good.

"The Court: Have you talked to [your sibling] about what has taken place, what the testimony has been, the people who are involved?

"[Juror A]: Well, in the beginning [my sibling] had asked me, who is the individual—the accused? And I told [my sibling] I got picked for—I mentioned the individual's last name. And [my sibling] just—I don't know who that is.

"The Court: Has [your sibling] mentioned that [your sibling] might know anybody in the victim's family or the victim?

"[Juror A]: No, that [my sibling] has not discussed with me at all.

"The Court: Has [your sibling] indicated whether [your sibling] knows the defendant's family or anybody related to him?

"[Juror A]: The defendant's family? No. [My sibling] told me when I told [my sibling] who the murder case

was about, who the accused was, [my sibling] did not know who the individual was.

"The Court: Okay. Now, from what . . . did you initiate any discussion with [your sibling]?

"[Juror A]: No. I mean, [my sibling] asked me and I might have told [my sibling] cause sometimes I check my voicemail—my cell phone. I say I have a missed call. I will tell [my sibling] we're still in court. I'll call you when I'm out of here. That aspect.

"The Court: Has any part of that affected you in any way so you couldn't continue to be a fair and impartial juror in the case?

"[Juror A]: No. No. Not whatsoever.

"The Court: And you haven't spoken to any other jurors?

"[Juror A]: Other jurors about the case?

"The Court: About the case.

"[Juror A]: Absolutely not. The jury has been really good about not talking about it, and if anything remotely comes close to talking about the case, then the jury members are quick to say, zip it. That's enough. And so, no, jurors have not gotten into detail at all about the case."

After the juror was excused from chambers, the court asked counsel if there were other questions they wanted the court to ask juror A. Both the prosecutor and defense counsel stated "no." The court then told counsel that it was going to retain juror A. The prosecutor did not object, but defense counsel did and stated: "Your Honor, I would object to that. [The sibling] at least has been in contact with the victim within a day or so of the crime. The context is that somebody that the victim knew was trying to sell him steroids, which is an illegal

substance. It can be trafficked in. So, I think that the closeness of relationship of the individual that knows the victim would have clearly, possibly—I would have moved for a challenge at the time of jury selection, if we had known that. At this point, I think that the opportunity for infection is great, especially in light of the court's inquiry into this individual about whether he knew the victim or the victim's family.

"The Court: To which [juror A] responded, no.

"[Defense Counsel]: Right. But [the sibling] clearly does or at least has been in contact.

"The Court: Well, [the sibling] does by virtue of this.

"[Defense Counsel]: Right. And [juror A], Your Honor, has not been able to follow the court's instructions regarding not discussing the case with anybody [because juror A] clearly said [juror A] discussed it with [the sibling]. And so as far as the court's instructions, [juror A] has been already tested on whether [juror A's] able to follow the court's instruction and [juror A] has not been able to do so. So, I think past history is a window into [juror A's] future conduct.

"The Court: [Prosecutor]?

"[The Prosecutor]: I didn't get the same impression from [juror A]. [Juror A] indicated that [juror A] was on a case. I think the court has indicated you can say you're on a case and do not discuss the contents of the testimony. I don't think [juror A] has done that. [Juror A] indicated [juror A] told [the sibling], I'm coming from court. I'm still in court. That does not allow, I would suggest, a reason that there is going to be a violation of your order.

"The issue about the family member; it's not going to be a witness, never was anticipated to be a witness. It's been disclosed for some period of time, these

records. But neither [defense counsel] nor I remember doing that during the examination or seeing this report that we had. But it's not going to be consequential in the case and wasn't planning to get into the record. They're a tool that was used in the investigation but they're not going to be presented by me at this point."

Again, the court indicated that it did not intend to excuse juror A. Nonetheless, the court had juror A brought in for further questioning.

"The Court: You may be seated. I just want to make sure I understand correctly. Have you talked with [your sibling] concerning the testimony at all?

"[Juror A]: Testimony? No. None at all.

"The Court: You mentioned who the parties were?

"[Juror A]: I mentioned who the accused was as far as the *State* v. *Zapata*, yes. And that's all. I'm having a hard time remembering individual names who take the stand as far as testimony goes. So, I more or less know them by face at this point. So, I have not mentioned, per se, that so-and-so by name—first or last name, took the stand. No, I had not mentioned at all.

"The Court: So, you haven't discussed the testimony that's taken place in the case?

"[Juror A]: No."

The court instructed juror A to return to the jury room and not to discuss the matter with the other members of the panel. Defense counsel objected to the court's failure to excuse juror A.[11]

---

[11] The in-chambers conference continued as the court questioned two other jurors. The court excused juror B, whose family learned about the trial from newspaper reports. Juror B's family expressed concern to juror B, as the family knew of the defendant's family and knew that juror B had met one of the witnesses. Juror B stated that it would be in the best interest of the defendant for juror B to be excused from the jury panel. After questioning juror C, the court and both counsel agreed that juror C need not be excused. On appeal, the defendant does not claim that he was harmed by his exclusion from the in-chambers inquiry with respect to jurors B and C.

## A

The defendant claims that the court denied him due process of law under both the federal and state constitutions[12] by excluding him from an in-chambers hearing to investigate claims of possible juror partiality, which he claims was a critical stage of the proceedings. We agree that the court excluded the defendant from a critical stage of the proceedings but conclude that the state has proved that the constitutional violations were harmless beyond a reasonable doubt.

### 1

In *United States* v. *Gagnon*, 470 U.S. 522, 526–27, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985), the United States Supreme Court explained that "[t]he constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, *e.g.*, *Illinois* v. *Allen*, 397 U.S. 337, [90 S. Ct. 1057, 25 L. Ed. 2d 353] (1970), but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him. In *Snyder* v. *Massachusetts*, 291 U.S. 97, [54 S. Ct. 330, 78 L. Ed. 674] (1934), the Court explained that a defendant has a due process right to be present at the proceeding whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only. *Id.* [105–106, 108]; see also *Faretta* v. *California*, 422 U.S. 806, [819 and n.15] 95 S. Ct. 2525, 45 L. Ed. 2d

---

[12] The defendant bases his claim on the due process right to be present at a critical stage of the proceedings on the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut. The defendant is not claiming that he was denied the right to confrontation.

562] (1975). The Court also cautioned in *Snyder* that the exclusion of a defendant from a trial proceeding should be considered in light of the whole record. [*Snyder* v. *Massachusetts*, supra, 115]."[13] (Internal quotation marks omitted.)

Our Supreme Court has stated that "a criminal defendant has a constitutional right to be present at all critical stages of his or her prosecution. *Rushen* v. *Spain*, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983) (the right to personal presence at all critical stages of the trial . . . are fundamental rights of each criminal defendant). Indeed, [a] defendant's right to be present . . . is scarcely less important to the accused than the right of trial itself. . . . *State* v. *Simino*, 200 Conn. 113, 127, 509 A.2d 1039 (1986)." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 271 Conn. 732. Our Supreme Court has recognized that a similar right to be present is guaranteed by article first, § 8, of our state constitution. See id., citing *State* v. *Jarzbek*, 204 Conn. 683, 691–92, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988). "The right

---

[13] Our Supreme Court applied the logic of *Snyder* in *State* v. *Gilberto L.*, 292 Conn. 226, 972 A.2d 205 (2009), when it concluded that the hospitalized defendant, Gilberto L., was not denied the right to be present at a critical stage of the proceedings when the court played back portions of trial testimony. "[Gilberto L.'s] mere presence during the playback would not have been useful because there was nothing he could have done that would have contributed to his defense." Id., 240. The court distinguished the state and federal cases relied on by Gilberto L.; see id., 240–41; stating that Gilberto L. "claims that he had a right to be present during the playback of testimony, *after* the trial court had responded to the jury and *after* counsel had agreed to the playback. Moreover, to the extent that [*State* v. *Shewfelt*, 948 P.2d 470, 473 (Alaska 1997)] is applicable, it is consistent with our reasoning because the court in that case concluded that, although the defendant had a right to be notified of the playback request, the error was not harmful because nothing during the playback was unusual or suggested that [Gilberto L.'s] absence was unusual." (Emphasis in original.) *State* v. *Gilberto L.*, supra, 242. The playback in *Gilberto L.* occurred after the court gave a curative instruction that the jury was not to draw an adverse inference from the defendant's absence. Id., 239.

to the effective assistance of counsel is grounded in the mandates of the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. Under both the federal constitution and the state constitution, however, the right to counsel is the right to counsel's effective assistance, and not the right to perfect representation or unlimited access to counsel." *Washington* v. *Meachum*, 238 Conn. 692, 732, 680 A.2d 262 (1996).

"In judging whether a particular segment of a criminal proceeding constitutes a critical stage of a defendant's prosecution, courts have evaluated the extent to which a fair and just hearing would be thwarted by [the defendant's] absence or whether his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. *Kentucky* v. *Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987)." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 271 Conn. 732. The United States Supreme Court explained more fully that although "this privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow . . . due process clearly requires that a defendant be allowed to be present to the extent that a fair and just hearing would be thwarted by his absence . . . . Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." (Citations omitted; internal quotation marks omitted.) *Kentucky* v. *Stincer*, supra, 745; see also *State* v. *McNellis*, 15 Conn. App. 416, 432, 546 A.2d 292 (voir dire of jurors concerning possible jury tampering was critical stage of criminal proceeding), cert. denied, 209 Conn. 809, 548 A.2d 441 (1988). "The defense [however] has no constitutional right to be present at every interaction between a judge and a juror

. . . *Rushen* v. *Spain*, [supra, 464 U.S. 125–26] (Stevens, J., concurring in judgment)." (Internal quotation marks omitted.) *State* v. *McNellis*, supra, 432.

This court previously has determined that the voir dire of jurors concerning possible jury tampering was a critical stage of the criminal proceedings.[14] See id., 433. "Moreover, the Supreme Court has emphasized that for the purposes of procedural due process a defendant's presence is required in proceedings concerning jury tampering. The trial court should determine the circumstances, the impact . . . upon the juror, and whether or not it is prejudicial, *in a hearing with all interested parties* . . . . *Remmer* v. *United States*, 347 U.S. 227, 229–30, 74 S. Ct. 450, 98 L. Ed. 654 (1954); see also *Smith* v. *Phillips*, 455 U.S. 209, 216–17, 217 n.7, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) (defendant's presence required in a *Remmer*-type hearing); cf. *Rushen* v. *Spain*, supra, [464 U.S.] 126–27 (Stevens, J., concurring) (defendant has a right to be present incident to his right to a hearing in cases of jury tampering)." (Emphasis in original; internal quotation marks omitted.) *State* v. *McNellis*, supra, 15 Conn. App. 432–33. "[T]o determine whether the in-chambers discussion constituted a critical stage of the proceedings, it is imperative that the record reveal the scope of discussion that transpired." *State* v. *Hazel*, 106 Conn. App. 213, 220, 941 A.2d 378, cert. denied, 287 Conn. 903, 947 A.2d 343 (2008).

This court's analysis in *McNellis*,[15] a case concerning allegations of jury tampering that arose during the presentation of evidence, guides our analysis in the present

---

[14] In *Lopez*, our Supreme Court held that an in-chambers conference regarding defense counsel's possible conflict of interest was a critical stage of the proceedings. *State* v. *Lopez*, supra, 271 Conn. 731. The defendant, Luis Fernando Lopez, was excluded from that in-chambers conference and no record was made of the conference. Id., 729 n.5, 734. The Supreme Court concluded that Lopez' absence from the in-chambers hearing was structural error and reversed his conviction and remanded that matter for a new trial. Id., 739–40. The right to conflict free counsel implicates a constitutional right different from the one presented in this case.

[15] This court affirmed the trial court's judgment in *McNellis*.

case. In *McNellis*,[16] "[t]he mid-trial voir dire proceeding bore a substantial relationship to [the defendant, William McNellis'] ability to defend himself because the line of questioning pursued by the court centered on the ability of each individual juror to remain impartial throughout the trial and then to render a verdict based solely on the evidence presented at trial." *State* v. *McNellis*, supra, 15 Conn. App. 433. The jurors' ability to remain impartial throughout trial was the issue facing the court in this case, as well.

"The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental

---

[16] The facts of *McNellis* follow. "After a weekend recess and prior to the resumption of [McNellis'] presentation of his case, it was brought to the attention of the court that over the weekend one or more of the jurors had received anonymous telephone calls concerning the case. The court informed the prosecutor and defense counsel in chambers about the situation. The parties and the court agreed to conduct an individual voir dire of each juror to determine exactly what had happened. The court preferred to conduct an in-chambers voir dire . . . but defense counsel requested a public proceeding, which the trial court granted.

"Counsel also requested that [McNellis] be allowed to be present at the voir dire proceeding to avoid any possible prejudice that might result on account of his absence from the proceeding. The trial court denied the . . . request, explaining: 'I don't think that he should be present and I don't want any possibility of coercion or intimidation. And I'm not saying that your client made those phone calls or [that] he had anybody make them . . . [but] under the circumstances I feel [that] these jurors should be questioned without his presence.' " (Citation omitted.) *State* v. *McNellis*, supra, 15 Conn. App. 428–29.

The court permitted McNellis to stay in an adjacent room where he could listen to the inquiry and provided him and his counsel with a transcript of the entire proceeding. Id., 429. The court "offered to give a cautionary instruction to the jury to disregard [McNellis'] absence"; id., 430; but McNellis asked that such an instruction not be given. Id. This court affirmed the judgment of conviction. Id., 450.

*McNellis* and this case are different in that William McNellis was removed from the courtroom to an adjacent room where he could hear the proceedings. In this case, the hearing was conducted in chambers, from which the defendant was excluded, and he could not hear what transpired.

attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." (Citations omitted; internal quotation marks omitted.) *State v. Sims*, 12 Conn. App. 239, 245, 530 A.2d 1069, cert. denied, 206 Conn. 801, 535 A.2d 1315 (1987).

In this case, the court was alerted, during the presentation of the state's evidence, to the possibility that one of the jurors was related to a person whose name appeared on the call list of what was presumed to be the victim's cellular telephone. The court's stated purpose of its inquiry was to determine whether juror A and the person whose telephone number appeared on the victim's cellular telephone were related and, if they were, whether they had discussed the trial. In keeping with *McNellis*, we conclude that the court's excluding the defendant from the hearing on possible juror partiality violated the defendant's right to be present.[17]

2

"A determination that the defendant's absence from a critical stage of the proceedings violated his constitutional rights does not end the inquiry that a reviewing court must conduct in deciding whether to order a new trial." *State v. Lopez*, supra, 271 Conn. 732. Both the United States Supreme Court and our Supreme Court have recognized that a violation of a criminal defendant's constitutional rights may be of two types: structural error or error subject to harmless error analysis.

---

[17] In its brief, the state argues that the defendant's misconduct during jury selection constituted an implicit waiver of his right to be present in chambers. The defendant disagrees. "[W]hether there has been an intelligent and competent waiver of the right to presence must depend, in each case, upon the particular facts and circumstances surrounding that case. . . . [A] waiver of the right to be present at a criminal trial may be inferred from certain conduct engaged in by the defendant after the trial has commenced." (Citation omitted; internal quotation marks omitted.) *State v. Simino*, supra, 200 Conn. 129. In this case, Judge Hauser predicated his decision to hold the hearing into possible juror partiality in chambers on the basis of Judge Comerford's protective order.

See *Chapman* v. *California*, 386 U.S. 18, 21–22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *State* v. *Lopez*, supra, 733.

"[T]here are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error . . . ." *Chapman* v. *California*, supra, 386 U.S. 23. "Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial itself. . . . Such errors infect the entire trial process . . . and necessarily render a trial fundamentally unfair . . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 271 Conn. 733–34. "[T]here is a very limited class of cases involving error that is structural, that is to say, error that transcends the criminal process." (Internal quotation marks omitted.) Id., 733.[18]

The United States Supreme Court has concluded, however, that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman* v. *California*, supra, 386 U.S. 22. The court in *Chapman* "has recognized that most constitutional errors can be harmless. . . . *Neder* v. *United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); see also *Arizona*

---

[18] In *State* v. *Lopez*, supra, 271 Conn. 733, our Supreme Court listed federal cases identifying the limited class of cases involving structural error. The list does not include the exclusion of a criminal defendant from proceedings regarding juror partiality.

v. *Fulminante*, 499 U.S. 279, 306, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). The harmless error doctrine is essential to preserve the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial. *Arizona* v. *Fulminante*, supra, 308; see also *Rose* v. *Clark*, 478 U.S. 570, 577, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986)." (Internal quotation marks omitted.) *State* v. *Lopez*, supra, 271 Conn. 732–33. Before a constitutional error may be held harmless under *Chapman*, a reviewing court "must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman* v. *California*, supra, 24. "The State bears the burden of proving that an error passes muster under this standard." *Brecht* v. *Abrahamson*, 507 U.S. 619, 630, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).

3

Since *Chapman*, "the United States Supreme Court has repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 504, 903 A.2d 169 (2006). We first determine whether the defendant's presence at the in-chambers hearing would have contributed to his ability to defend against the charges. See *United States* v. *Gagnon*, supra, 470 U.S. 526–27. We then consider the evidence presented at trial. In light of the whole record; see id.; we conclude that excluding the defendant from the in-chambers hearing was not structural error and that the state has demonstrated that the error was harmless beyond a reasonable doubt.[19]

---

[19] The focus of the defendant's argument on appeal is juror A, not jurors B and C. If the defendant's exclusion from the in-chambers hearing were structural error, the error would pertain to the entire proceeding, not just to the portion of the hearing concerning juror A.

The need for a hearing to investigate possible jury partiality arose when it was discovered that a surname appearing on the call list of the cellular telephone found at the scene of the murder was the same as the surname of one of the jurors. The name apparently is unusual. The purpose of the inquiry, as stated by the court, was twofold: (1) to determine whether the person whose name appeared on the cellular telephone and the juror were related, and (2) if they were related, whether they were talking about the trial. The record discloses that the individual whose name appeared on the cellular telephone and juror A are siblings. The siblings had discussed the matter only to the extent of identifying the accused and noting when juror A was in court and not in court. Juror A's sibling did not know the defendant. At the conclusion of the court's questioning, neither the prosecutor nor defense counsel had further questions to ask of juror A. Defense counsel objected to the court's failure to excuse juror A from the jury, arguing that the sibling had been in contact with the victim within days of the murder for the purpose of selling him steroids and knew the victim. The record does not support defense counsel's argument.

On appeal, the defendant relies on *Remmer* v. *United States*, supra, 347 U.S. 229 (jury tampering case), for the principle that any direct or indirect private communication or contact with a juror in a pending case is presumptively prejudicial. We acknowledge the presumption in *Remmer* but note that the presumption is not conclusive. Id. "[T]he burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Id.

There are no factual findings in the record—indeed, no facts in the record—to support the contention that juror A's sibling knew the victim. The sibling was never

questioned, and the record does not contain foundational findings regarding the telephone call and the sibling's assumed relationship with the victim. The defendant's argument regarding a relationship between the victim and juror A's sibling is predicated on assumptions. There are no factual findings in the record that the victim and juror A's sibling knew one another, that one of them placed a telephone call to the other, that they actually spoke to one another and, if they did, what they talked about. It is hypothetically possible that the sibling's name appeared on the cellular telephone as the result of a wrong number or that someone other than the sibling used that cellular telephone to make a call Juror A's sibling was not questioned as to why the sibling's name appeared on the cellular telephone or whether the sibling would have known of this. The sibling was the only person who could have provided that information, if at all. Moreover, there is nothing in the record to suggest that juror A's sibling had ever spoken to the victim about steroids.

The issue to be determined during the hearing was whether juror A had been exposed to information not in the record and whether juror A could be fair and impartial in deciding the case. The salient questions were whether juror A knew something about the defendant, the victim and the witnesses that juror A had obtained from a source other than the evidence presented at trial. In response to the court's questions, juror A informed the court that the sibling did not know the defendant and that juror A and the sibling did not discuss the evidence presented at trial. Juror A assured the court that the juror knew nothing about the case beyond the information that the juror had gleaned in the courtroom. Juror A also assured the court that the general discussions about the case that juror A had with the sibling had not affected the juror's ability to be fair and impartial.

Although a juror's assurances that he or she is equal to the task of being fair and impartial are not dispositive, we are "aware of the broad discretion of a trial judge which includes his determination of the credibility to be given a juror's statement in this context." *State* v. *Sims*, supra, 12 Conn. App. 246. It is well settled that appellate courts do not make credibility determinations from the cold face of the record. *Somers* v. *Chan*, 110 Conn. App. 511, 530, 955 A.2d 667 (2008). We therefore conclude that although the court's excluding the defendant from the in-chambers hearing deprived him of his constitutional right to be present during a critical stage of the proceedings, the court's error was harmless beyond a reasonable doubt.[20]

The defendant also has argued that he had a right to be present during the in-chambers hearing to confront juror A face-to-face because his presence would have made it more difficult for juror A to lie. See *State* v. *Jarzbek*, supra, 204 Conn. 694–95. We do not know what transpired during the voir dire of juror A because the record is incomplete, but there is nothing in the record that causes us to question whether the defendant was present when juror A was questioned by both counsel during individual voir dire prior to the start of evidence. The in-chambers hearing was triggered by the happenstance of an unusual surname found on the cellular

---

[20] During oral argument before this court, the defendant's counsel relied heavily on the case of *State* v. *Matt*, 347 Mont. 530, 199 P.3d 244 (2008). In that case, the question of whether the defendant, William John Matt, was denied the right to be present during a critical stage of the proceedings was decided on the basis of the constitution of the state of Montana, which guarantees defendants "the constitutional right to appear and defend 'in person.' " Id., 537. The Supreme Court of Montana held that "under Article II, Section 24 [of the constitution of Montana], the in-chambers conference at which the District Court heard arguments on evidentiary issues and ruled on Matt's motion to dismiss for insufficient evidence constituted a critical stage of his trial, for which Matt had a constitutional right to be present." Id. The constitution of Connecticut does not contain a similar provision. *Matt* therefore is not applicable.

telephone that the police had recovered, which was the same as juror A's surname. Because it is standard procedure for the court to tell the members of a venire panel about the general nature of the trial and the names of the parties and for counsel to tell the prospective jurors the names of potential witnesses, we have no reason to doubt that juror A had heard the victim's name. Because it is standard for counsel to ask prospective jurors whether there is anything about the witnesses or the nature of the trial that would prevent them from being fair and impartial, we also have no reason to doubt that juror A was asked that question in the defendant's presence before juror A was selected to be a member of the jury.

The defendant argues that if he had been present during the in-chambers hearing, he may have been able to suggest questions to counsel that would have elicited answers demonstrating that juror A had obtained information from a source other than evidence. The defendant argues that he may have been able to suggest such questions because he lived in the Pembroke Street area and, therefore, would have been able to assist counsel in fashioning questions to ferret out the hypothesized relationship between the victim and juror A's sibling. We note that the in-chambers inquiry came about not because names had appeared on the cellular telephone but because one of the surnames was particularly unusual and was the same surname as juror A. If the defendant lived in the Pembroke Street area and the surname was so unusual, all of that was known to the defendant at the time of individual voir dire. We assume that if the defendant had any information that would have informed defense counsel's individual voir dire of juror A, he would have shared it with counsel at that time. Moreover, the record discloses that defense counsel and the defendant were able to confer prior to the commencement of the in-chambers hearing. See part I

B 2 of this opinion. The defendant should have been able to suggest questions at that time, on the basis of the information on the cellular telephone, given his personal knowledge of the Pembroke Street area. We also assume that defense counsel relayed to the defendant what had occurred during the in-chambers hearing and that the defendant would have brought relevant information he knew to the attention of defense counsel at that time. Defense counsel was free to ask the court to continue its inquiry of juror A on that basis.

The defendant also argues that if we conclude that the constitutional violation of excluding him from the in-chambers inquiry is subject to harmless error analysis, the error was not mitigated due to the court's failure to give a curative instruction. If there was error on the part of the court for failing to give a curative instruction, the defendant cannot prevail on that basis, as the error was induced. The defendant rejected the court's offer to provide a curative instruction. A defendant may not pursue one strategy at trial and seek to overturn an adverse result on appeal by taking a different strategic path. *State* v. *Davis*, 76 Conn. App. 653, 662, 820 A.2d 1122 (2003).

Although we conclude that the court denied the defendant the right to be present during the in-chambers hearing, the deprivation did not deprive the defendant of the ability to defend against the charges. Defense counsel was able to consult with the defendant prior to the commencement of the in-chambers hearing. The record establishes that defense counsel was present in chambers to safeguard the defendant's rights and that defense counsel objected to the court's retaining juror A.[21] The defendant has not explained how the court's ruling would have been different if he had been present.

[21] The court also provided the defendant with a transcript of the in-chambers hearing.

There was no conclusive evidence to establish that the cellular telephone belonged to the victim, that the victim knew or conversed with juror A's sibling, and juror A told the court that the juror and the sibling had not discussed the victim.

Moreover, there was direct and circumstantial evidence that the defendant had shot the victim. Eyewitnesses testified that they saw the defendant shoot the victim, others heard the defendant admit to the crime. On the basis of the whole record, we conclude that the court's error in excluding the defendant from the in-chambers hearing was harmless beyond a reasonable doubt.

4

The defendant next argues that his exclusion from the in-chambers hearing on possible juror partiality violated the provisions of Practice Book §§ 42-6, 44-7 and 44-8. To the extent that the rules of practice are grounded in the constitutional rights to due process, the argument is subsumed in our resolution of the defendant's constitutional claims. To the extent that the argument claims that the court abused its discretion by precluding him from the in-chambers hearing, the claim is unpreserved and not reviewable. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) (unpreserved claims must be of constitutional magnitude to warrant review).

B

The defendant also claims that, by excluding him from the in-chambers hearing into possible juror partiality, the court denied him the right to counsel. We disagree.

1

It is axiomatic that a criminal defendant has the right to counsel pursuant to both the federal and state constitutions. U.S. Const., amends. VI and XIV; Conn. Const.,

art. I, § 8; see, e.g., *Gideon* v. *Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 199 (1963); *State* v. *Mebane*, 204 Conn. 585, 589–90, 529 A.2d 680 (1987), cert. denied, 484 U.S. 1046, 108 S. Ct. 784, 98 L. Ed. 2d 870 (1988). The sixth amendment right to the assistance of counsel "is meant to assure fairness in the adversary criminal process." *State* v. *Mebane*, supra, 589.

2

As our recitation of the proceedings in the courtroom prior to the in-chambers hearing indicates, the defendant was represented by counsel who twice objected to the exclusion of the defendant from the in-chambers hearing. See part I of this opinion. According to the transcript of the hearing, defense counsel was present in chambers and made certain requests and objections on behalf of the defendant. He also objected to the court's failure to excuse juror A in chambers and later in the courtroom.

The defendant states in his brief that a recess occurred prior to the commencement of the in-chambers hearing. The record does not indicate that defense counsel was not able to consult with the defendant prior to going into the in-chambers hearing. During the in-chambers hearing, defense counsel never asked to speak with the defendant, and nothing in the record indicates that the court would have objected to defense counsel's request to speak with the defendant. Compare *State* v. *McNellis*, supra, 15 Conn. App. 434 (court permitted defendant and counsel to confer about matter). This case, therefore, is unlike *Geders* v. *United States*, 425 U.S. 80, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976), and *State* v. *Mebane*, supra, 204 Conn. 585. In both *Geders* and *Mebane*, the trial courts prohibited defense counsel from conferring with their respective clients, the criminal defendants, during a recess from the governments' examination of the defendants.

In *Mebane*, the majority concluded that the court's order that defense counsel not confer with the defendant, James R. Mebane, during a recess that occurred during the defendant's examination by the state; *State v. Mebane*, supra, 204 Conn. 588–89; was structural error requiring the reversal of Mebane's conviction. In his concurring opinion, Justice Shea adopted the position of the United States Court of Appeals for the Second Circuit in *United States* v. *DiLapi*, 651 F.2d 140 (2d Cir. 1981), cert. denied, 455 U.S. 938, 102 S. Ct. 1427, 1428, 71 L. Ed. 2d 648 (1982), which rejected the per se reversal rule and applied harmless error analysis. *State* v. *Mebane*, supra, 603–604 (*Shea, J.*, concurring). *Geders* left "unresolved the issue of whether automatic reversal is required where a court prohibits communication between attorney and client during a trial recess of brief duration . . . ." (Citation omitted.) Id., 603–604 (*Shea, J.*, concurring). Inasmuch as the court in the case before us now did not forbid the defendant from conferring with counsel but, instead, created a circumstance in which the defendant and defense counsel were not physically together during the in-chambers proceeding, we conclude that the defendant was not deprived of his right to counsel, and even if he were, the circumstances of his deprivation is subject to harmless error analysis.

In his brief, the defendant argues that "the defendant's right to be present is an essential concomitant of a defendant's right to effective assistance of counsel." *United States* v. *Washington*, 705 F.2d 489, 497 (D.C. Cir. 1983). In *Washington*, the District Court held a sidebar voir dire of prospective jurors concerning their involvement, if any, in the criminal justice system in order to protect their confidentiality. Id., 496. The defendant, Myrtle D. Washington, asked to be present at the sidebar voir dire. Id. Although she was able to see the sidebar voir dire, she was not able to hear the inquiry.

Id. The United States Court of Appeals for the District of Columbia Circuit held that the District Court improperly excluded Washington from the sidebar voir dire pursuant to rule 43 (a) of the Federal Rules of Criminal Procedure, "not directly on the Sixth Amendment confrontation clause or the due process guarantee of the Constitution."[22] Id., 498 n.5. The Court of Appeals found, on the basis of the record, that the District Court's error was harmless beyond a reasonable doubt. Id., 498. We now evaluate the facts before us in light of that standard.

3

As noted, the defendant posits that had he been present during the in-chambers hearing, he may have suggested questions to ask juror A, but he does not state what those questions might be. The record does not include a complete transcript of the individual voir dire of prospective jurors. The defendant does not claim that he was not present when juror A initially was questioned prior to the beginning of evidence. The defendant argues that had he been present during the in-chambers hearing, he would have been in a position to suggest additional areas of questioning of juror A because the defendant "lived in the area [of Pembroke Street] and may have had relevant information about [juror A's] sibling and/or the victim." It does not follow, however, that juror A would have been able to answer questions regarding the sibling and the victim. Moreover, following the in-chambers hearing, defense counsel was free to inform the defendant of what had transpired. If the defendant had questions about the proceedings, he

---

[22] "Although [Fed. R. Crim. P.] 43 (a) has constitutional underpinnings, the protective scope of rule 43 (a) is broader than the constitutional rights embodied in the rule. . . . The constitutionally mandated minimum protection a defendant is entitled to under rule 43 (a) is fundamental fairness. . . . This minimum of fairness was certainly met in this case, since peremptory challenges are statutory, not constitutional, in origin." (Citations omitted.) *United States* v. *Washington*, supra, 705 F.2d 498 n.5.

could have communicated them to his counsel who could have brought the defendant's questions to the attention of the court. For those reasons and the reasons set forth in part I A of this opinion, we conclude that the claimed deprivation of the right to counsel was harmless beyond a reasonable doubt.

### C

The defendant also claims that his exclusion from the in-chambers hearing deprived him of the right to the presumption of innocence. We do not agree.

### 1

All criminal defendants are entitled to the presumption of innocence pursuant to the fifth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut. *State* v. *Amado*, 254 Conn. 184, 197, 756 A.2d 274 (2000).

### 2

The essence of the defendant's claim is that if juror A feared that the juror's own safety was in danger from the defendant, juror A did not presume that the defendant was innocent. This claim is purely hypothetical. The record contains nothing that would lead this court to conclude that juror A, or any of the jurors, feared the defendant. The prosecutor requested that the hearing into juror impartiality be conducted in chambers principally on the basis of Judge Comerford's protective order. Judge Comerford's protective order was granted, in part, in light of Perez' testimony at the hearing in probable cause. Perez was fearful of the defendant. The prosecutor also noted that juror B had indicated that juror B was familiar with the defendant or witnesses. The prosecutor stated that if juror B had negative comments to make about the defendant, he did not want those comments made in open court where they could be reported by the press and possibly come to the

attention of other jurors. The defendant has failed to explain what would have caused juror A to infer anything from the in-chambers hearing that would affect the defendant's right to the presumption of innocence. The subject of the hearing concerned juror A, juror A's sibling and communication they had, if any, about the trial.

## II

The defendant raises a second set of claims that the court erred by retaining juror A (1) whose sibling's telephone number appeared on the cellular telephone presumed to be the victim's several days before the murder, (2) who violated the court's instructions by discussing the case with the sibling and (3) who supposedly was alerted by the court's inquiry to prejudicial information about the defendant. We disagree.

"[J]ury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . The United States Supreme Court has noted, however, that the [c]onstitution does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. . . . Were that the rule, few trials would be constitutionally acceptable. . . . We have recognized, moreover, that [t]he trial court, which has a first-hand impression of [the] jury, is generally in the

best position to evaluate the critical question of whether the juror's or jurors' exposure to improper matter has prejudiced a defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, 288 Conn. 236, 248–49, 951 A.2d 1257 (2008).

A

In his brief, the defendant argues that "the record is more than adequate to show the error of retaining [juror A] whose sibling had a relationship with the victim, who had violated the court's orders by discussing the case with that same sibling, and where the hearing itself alerted the juror to a relationship between the victim and [the] sibling, if [juror A] had been unaware of it." We do not agree.

As mentioned, the record contains no evidence that the cellular telephone belonged to the victim. Even if we assume, however, that the cellular telephone belonged to the victim, there is no evidence to explain how or why the telephone number of juror A's sibling appeared on that telephone and whether there ever had been a conversation between the sibling and the victim.[23] The defendant's arguments are predicated on an assumption about a supposed relationship between the victim and the sibling, but there are no factual findings in the record to support that assumption. The key questions to be answered during the in-chambers hearing were whether juror A and the sibling discussed the evidence and whether the sibling told juror A that the sibling knew the victim. The transcript of the preliminary discussion in the courtroom at which the defendant was present and the in-chambers hearing indicate that the answers to both questions are "no": juror A did not discuss the evidence with the sibling and the

[23] There was no evidence presented to the court as to the circumstances under which the sibling's name and telephone number appeared on the cellular telephone in question.

sibling did not indicate to juror A that the sibling knew the victim. There was no basis, therefore, for the court to excuse juror A.

B

The defendant also has argued that juror A should have been excused for failing to abide by the court's order not to discuss the case prior to jury deliberations. The record reveals that juror A had some general discussions with juror A's sibling about the case for which the juror was called for jury duty. The discussions, however, did not, in our view, implicate the defendant's right to an impartial jury.

"Juror misconduct which results in substantial prejudice to the defendant is not to be tolerated. But not every irregularity in a juror's conduct compels reversal. The dereliction must be such as to deprive the defendant of the continued, objective and disinterested judgment of the juror, thereby foreclosing the accused's right to a fair trial. . . . Consideration of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury. . . . A presumption of prejudice may also arise in cases involving communications between a juror and third persons. . . . But unless the nature of the misconduct on its face implicates his constitutional rights the burden is on the appellant to show that the error of the trial court is harmful." (Internal quotation marks omitted.) *State* v. *Stuart*, 113 Conn. App. 541, 552–53, 967 A.2d 532, cert. denied, 293 Conn. 922, 980 A.2d 914 (2009).

Trial courts, including the court in this case, repeatedly instruct jurors not to discuss the case with anyone until the jury retires for deliberations. We do not construe juror A's limited communication with the sibling, detailed previously, to have violated the court's instructions in any meaningful way. Family members have a

natural interest and concern in the day-to-day whereabouts and activities of other family members, and that concern does not dissipate when someone is called to jury duty. Responding to a voice message by saying that "I'm still in court" or indicating the name of a case falls far short of creating concern about the juror's ability to be fair and reach a verdict on the evidence.

## C

The defendant claims that the in-chambers inquiry alerted juror A to prejudicial information about the defendant. The essence of the claim is that the in-chambers inquiry alerted juror A to the relationship between juror A's sibling and the victim. Again, this claim is premised on speculation. As noted, there is no evidence that juror A's sibling and the victim had a relationship. Moreover, none of the questions asked of juror A by the court intimated that there was a relationship between the victim and juror A's sibling. There is no factual basis for the defendant's claim, which we reject.

## D

The defendant also argues that the court did not press juror A for enough information. Here, the court queried juror A as to whether the juror had discussed the case with the sibling. Juror A responded that the sibling had asked how the case was going, and the juror stated that "it's starting to get juicy and it's getting good." The court followed up juror A's response with the question: "Have you talked to [your sibling] about what has taken place, what the testimony has been, the people who are involved?" In response to the court's question, juror A stated that the juror had mentioned the defendant's last name. The sibling did not know the defendant. Juror A also informed the court that the sibling had not discussed the victim at all with the juror. Juror A told the court that the juror could remain fair and impartial. After juror A was excused and a conversation ensued

between the court and counsel, the court called the juror back into chambers and asked additional questions as to whether juror A had discussed the parties, witnesses and testimony with the sibling. Juror A told the court that the juror had not had any such discussions with the sibling. Essentially, the only information juror A conveyed to the sibling was the defendant's name. The sibling did not know the defendant.

"Our review on appeal is limited to the inquiry of whether the court's review of the alleged jury misconduct can be characterized fairly as an abuse of discretion." *State* v. *Kamel*, 115 Conn. App. 338, 343, 972 A.2d 780 (2009). "[T]he trial court has broad discretion to determine the form and scope of the proper response to allegations of jury misconduct . . . [and] the trial court must zealously protect the rights of the accused." (Citation omitted; internal quotation marks omitted.) Id., 343–44. On the basis of our review of the record in this case, we cannot conclude that the court abused its discretion when it conducted its inquiry of juror A.

"To ensure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment . . . a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality. . . .

"Any assessment of the form and scope of inquiry that a trial court must undertake when it is presented with allegations [or the possibility] of juror [bias or] misconduct will necessarily be fact specific. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged [or possible] jury misconduct can fairly be characterized as an abuse of its discretion. . . . Although we recognize that trial [c]ourts face a delicate and complex task

whenever they undertake to investigate [the possibility] of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . Ultimately, however, [t]o succeed on a claim of [juror] bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact. . . .

"Consequently, the trial court has wide latitude in fashioning the proper response to allegations [of the possibility] of juror bias. . . . [W]hen . . . the trial court is in no way responsible for the [possible] juror misconduct [or bias], the defendant bears the burden of proving that the misconduct [or bias] actually occurred and resulted in actual prejudice. . . .

"[W]here the defendant claims that the court failed to conduct an adequate inquiry into possible juror bias or prejudice, the defendant bears the burden of proving that such bias or prejudice existed, and he also bears the burden of establishing the prejudicial impact thereof." (Internal quotation marks omitted.) *State* v. *Osimanti*, 111 Conn. App. 700, 714–15, 962 A.2d 129 (2008), cert. granted on other grounds, 290 Conn. 914, 965 A.2d 554 (2009).

The transcript of the in-chambers hearing reveals that the court asked juror A whether juror A's discussions about the general facts of this case had affected juror A's ability to be fair and impartial. Juror A responded: "No. No. Not whatsoever." Juror A also answered "no" when the court asked the juror whether the juror had discussed the testimony with the sibling. After the juror was excused from the court's chambers but before the juror was recalled to chambers for further questioning, defense counsel stated that "the opportunity for infection is great, especially in light of the court's inquiry

into this individual about whether [the individual] knew the victim or the victim's family." The court reminded defense counsel that juror A said that the sibling had not discussed the victim or his identity with the juror.

As we said previously, the court is the arbiter of credibility when assessing juror bias. *State* v. *Sims*, supra, 12 Conn. App. 246. The key issue is whether juror A could be fair and impartial in deciding the defendant's case. The court determined that there was no reason to excuse juror A. We conclude, on the basis of our review of the record, that that the defendant has failed to raise above the realm of speculation his claims that juror A was partial or that juror A's sibling actually knew the victim. The court, therefore, did not abuse its discretion by retaining juror A.

### III

The defendant claims finally that the court erroneously charged the jury as to reasonable doubt. In his brief, the defendant concedes that his claim of instructional error has been rejected by our Supreme Court. See, e.g., *State* v. *Reynolds*, 264 Conn. 1, 106, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Griffin*, 253 Conn. 195, 207, 749 A.2d 1192 (2000). The defendant indicates that he raised the claim here to preserve it for possible federal review. See *Johnson* v. *Commissioner of Correction*, 218 Conn. 403, 422, 589 A.2d 1214 (1991). The defendant cannot prevail, as the issue has been settled by our Supreme Court, whose rulings are binding on this court. See *State* v. *Martinez*, 95 Conn. App. 162, 193, 896 A.2d 109, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006).

The judgment is affirmed.

In this opinion the other judges concurred.