******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DANIEL SMITH
(AC 35393)

Beach, Bear and Sheldon, Js.*

*Argued February 6—officially released June 3, 2014*

(Appeal from Superior Court, judicial district of New Haven, Damiani, J. [judgment]; Clifford, J. [motion to correct].)

*Katharine S. Goodbody*, assigned counsel, for the appellant (defendant).

*Brett R. Aiello*, special deputy assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Daniel Smith, appeals from the trial court's denial of his amended motion to correct illegal sentence under Practice Book § 43-22,[1] in which he challenged the legality of the manner in which his current thirty year prison sentence for accessory to manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-8 and 53a-55a came to be imposed upon him. The challenged sentence was imposed pursuant to the defendant's agreement with the state to plead guilty to a substituted information charging him with accessory to manslaughter in the first degree with a firearm instead of going to trial on his more serious original charges, including murder under General Statutes § 53a-54a, after the sentencing court, *Damiani, J.*, reinstated the original charges upon finding that he had violated the terms of an earlier, more favorable plea agreement, under which he had pleaded guilty to and was to have received a total effective sentence of no more than twenty-five years in prison on the less serious charges of conspiracy to commit murder, in violation of General Statutes §§ 53a-48 and 53a-54a, and carrying a pistol without a permit, in violation of General Statutes § 29-35.

On appeal, the defendant claims that the sentencing court erred in finding that he had violated the terms of his initial plea agreement, and thus in vacating his initial guilty pleas and reinstating his original charges against him. On that basis as well, he claims that the trial court, *Clifford, J.*, erred in denying his amended motion to correct illegal sentence, wherein he claimed that his current sentence was imposed upon him in an illegal manner because he would not have been constrained to enter into the second plea agreement, pursuant to which it was imposed, had the sentencing court not vacated his initial guilty pleas and reinstated his original charges.

The state argues that the trial court lacked subject matter jurisdiction to hear and adjudicate the defendant's amended motion to correct because the motion improperly challenged the legality of his *conviction* for accessory to manslaughter in the first degree with a firearm under his second plea agreement, instead of his thirty year *sentence* for that offense. We agree.

The following facts and procedural history are relevant to our resolution of this appeal. On November 29, 2005, the defendant and two other individuals, Hudel Gamble and Ricardo Ramos, shot and killed Marquis White in a drive-by shooting on Kensington Street in New Haven. Forensic examination of the bullets recovered from White's body during an autopsy revealed that he had been shot with three different types of firearms on the evening in question, supporting an inference that the defendant and both of his companions had fired

their weapons at him. The defendant later was arrested by New Haven police in connection with the incident on charges of murder under § 53a-54a, conspiracy to commit murder under §§ 53a-48 and 53a-54a, illegal possession of an assault weapon under General Statutes § 53-202c, conspiracy to possess an assault weapon under §§ 53a-48 (a) and 53-202c, and carrying a pistol without a permit under § 29-35 (a).

On November 6, 2006, approximately one year after the defendant was arrested, he pleaded guilty, as aforesaid, to charges of conspiracy to commit murder and carrying a pistol without a permit pursuant to his initial plea agreement with the state. Under the terms of that agreement, the defendant expressly agreed to "articulate and indicate [at Gamble's then impending trial] who did the shooting that led to the death of the decedent in this case and indicate who fired what." Consistent with that agreement, at the very outset of the defendant's plea proceeding, the sentencing court explained to him as follows, in the presence of his mother, who accompanied him, how the length of his sentence would depend upon the nature and quality of his testimony at Gamble's trial:

"The Court: [The defendant] is going to articulate his involvement in the shooting that night before me in open court. Now, Mr. Gamble is going to start his jury selection today. He—it was he, Mr. Ramos, and [the defendant] in the car. If [the defendant] is called to testify by the state of Connecticut, and if he testifies truthfully in accordance with what he tells me in open court today . . . then at the time of sentencing, I'll listen to the state . . . and I'll decide if he's going to get twenty, twenty-one, twenty-two, whatever . . . . It can't be more than twenty-five. If he takes the stand during the Gamble trial and just doesn't cooperate and everything [has] to be pulled out of him piece by piece, then he's looking at the twenty-five years for sure. . . . And if he ends up testifying at the trial that what he told me here is not the truth, then I'm going to vacate his pleas and put him on trial. Because I'm agreeing to this based upon what you're going to tell me, Mr. Smith. Do you understand that?

"The Defendant: Yes, sir.

"The Court: So, if the truth is that you were the only shooter and you take the stand and [say], 'Gamble had nothing to do with it, I did it all,' I'm going to vacate your plea and you are going to go to trial on murder. Do you understand that?

"The Defendant: Yes."

After receiving the court's foregoing explanation, and acknowledging his understanding of it, the defendant pleaded guilty, as he had agreed, to the charges of conspiracy to commit murder and carrying a pistol without a permit, and then admitted on the record to his

involvement in the shooting, inculpating himself as well as Gamble and Ramos. Specifically, he explained his and his companions' involvement in the events of the evening in question as follows:

"The Defendant: We were driving around—

"The Court:—you are in a car. Who's driving?

"The Defendant: It was me.

"The Court: And who else was in the car with you?

"The Defendant: Ricardo Ramos and Hudel.

"The Court: Ramos and Hudel Gamble?

"The Defendant: Yes.

"The Court: Now, who's in the front seat with you?

"The Defendant: Ramos.

"The Court: And Gamble's in the back?

"The Defendant: Yes.

"The Court. Okay. So, you're driving around, what happens?

"The Defendant: We're driving around, began, uh, smoking marijuana—

"The Court:—you're smoking marijuana. Go ahead.

"The Defendant: We was driving down Kensington Street—

"The Court:—Kensington?

"The Defendant: Yes.

"The Court: Go ahead.

"The Defendant: We stopped first to—drawing out a little bit more crowd of people. They start shooting— then—

"The Court:—so, the crowd of people started shooting at you?

"The Defendant: Yes.

"The Court: And then what happened?

"The Defendant: Then we all started firing back.

"The Court: What kind of gun did you have?

"The Defendant: .357.

"The Court: What kind of gun did Mr. Ramos have?

"The Defendant: The shooter.

"The Court: The SK-47?

"The Defendant: Yes.

"The Court: What kind of gun did Mr. Gamble have?

"The Defendant: .22.

"The Court: And all three of you were firing at the

crowd?

"The Defendant: Yes.

"The Court: And one person got hit?

"The Defendant: Yes."

At the end of this detailed colloquy, the sentencing court revisited as follows the issues of the defendant's responsibility, under the plea agreement, to testify truthfully at Gamble's trial and the consequences of failing to do so:

"The Court: Now, your responsibility [is] that if [you are] called to testify, that you testify truthfully based upon what you just told me. Do you understand that?

"The Defendant: Yes.

"The Court: If that's not the truth—tell me that now.

"The Defendant: The truth.

"The Court: But if you go and are called at the Gamble trial and you end up changing your story, then it's not going to be the truth and I'm going to vacate your plea. You're going to go on trial. Do you understand that?

"The Defendant: Yes."

Thereafter, following brief additional questioning by the court and counsel as to the precise location of the crowd from which gunshots had been fired at the defendant and his companions before they returned fire,[2] the sentencing court accepted the defendant's pleas and continued the case for sentencing.

At Gamble's trial, when the state called the defendant to testify in accordance with his plea agreement, the defendant invoked his fifth amendment privilege against self-incrimination and refused to testify. Thereafter, the state promptly moved to vacate the defendant's prior guilty pleas. At a later hearing on that motion, the sentencing court, *Damiani, J.,* found that the defendant "didn't live up to his end of the bargain by testifying truthfully at the trial," and thus granted the motion, whereupon all of the original charges against the defendant, including murder, were reinstated against him.

The state and the defendant subsequently reached a new plea agreement under which the defendant agreed to plead guilty to accessory to manslaughter in the first degree with a firearm, which carries a maximum possible sentence of forty years' imprisonment. The agreed upon sentence to be imposed on the defendant under his new plea agreement was thirty years' imprisonment. The court subsequently accepted the defendant's guilty plea to accessory to manslaughter in the first degree with a firearm after conducting a full canvass in open court, and later sentenced him on that charge to thirty years' imprisonment.

Five years later, the defendant, initially representing himself, filed a motion to correct illegal sentence. After counsel was appointed to represent him pursuant to General Statutes § 51-296 (a),[3] the defendant filed the amended motion to correct. In his amended motion, the defendant claimed that the vacation of his initial guilty pleas violated his initial plea agreement, pursuant to which he should have been given a total effective sentence of twenty-five years' imprisonment due to his failure to cooperate with the state at Gamble's trial. On September 26, 2012, the trial court, *Clifford, J.*, heard argument on the amended motion to correct. At that hearing, the defendant argued that the invocation of his fifth amendment privilege against self-incrimination did not constitute testifying falsely at Gamble's trial, which he claimed to be the necessary precondition to vacating his guilty pleas and reinstating the original charges against him. Instead, he argued, his conduct constituted not cooperating with the state at that trial, which should have resulted in the imposition of a sentence of twenty-five years' imprisonment. The court denied the motion, explaining its logic as follows: "[The defendant] certainly violated the first option . . . where, if he testified in accordance with the statement he made at the time when he pled guilty and he testified truthfully in accordance with that, he could have gotten a sentence of twenty years. Well, he certainly did not do that.

"And then the other option . . . if he took the stand and doesn't cooperate and everything is kind of pulled out of him piece by piece, then he would get twenty-five years.

"And then that last option, that if he testifies that what he said during the guilty plea was not the truth and just rejects all of that and testifies in a different version, then [the court] would have . . . vacat[ed] the plea." The court concluded that "clearly, the defendant violated the spirit of that agreement . . . he did not cooperate. He did not testify truthfully. He did not testify at all." Furthermore, although the court did not question its own jurisdiction to hear the defendant's amended motion to correct, it noted that "really, what should have happened at the time when the judge was vacating his plea, [is that] the lawyer should have objected to that, and there should have been an appeal for violating the plea agreement because . . . what he was sentenced on was actually quite a legal sentence. He rebargained, pled guilty to this manslaughter charge, agreed to thirty years and received thirty years. So, he did a whole brand new bargain. So, this new sentence is clearly a legal sentence and imposed . . . in a legal manner." The court ultimately denied the motion on two grounds: "One is that . . . [the defendant] did violate the agreement, which allowed the vacating of the plea," and the other is "that the present sentence clearly

was a sentence imposed in a legal manner because there [were] new negotiations, and this last plea and sentencing [of] thirty years was clearly a correct sentence." This appeal followed.

As a threshold matter, we must address the state's claim that the trial court lacked jurisdiction to consider the defendant's amended motion to correct illegal sentence because his motion improperly sought to challenge the legality of his conviction rather than his sentence, as required to obtain relief under Practice Book § 43-22. "It is axiomatic that jurisdiction involves the power in a court to hear and determine the cause of action presented to it and its source is the constitutional and statutory provisions by which it is created. . . . The Superior Court is a constitutional court of general jurisdiction. In the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law. . . . Issues regarding subject matter jurisdiction present a question of law, and, therefore, we employ the plenary standard of review. . . . Last, we note our Supreme Court's instruction that in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged. . . .

"Our jurisprudence recognizes that the jurisdiction of a sentencing court terminates once that sentence has begun and, thus, that court may not take any action affecting the sentence unless it expressly has been authorized to act. . . . Both this court and our Supreme Court, however, have stated that courts have the power to correct an illegal sentence." (Citations omitted; internal quotation marks omitted.) *State* v. *Koslik*, 116 Conn. App. 693, 697, 977 A.2d 275, cert. denied, 293 Conn. 930, 980 A.2d 916 (2009). As explained by our Supreme Court in *State* v. *Lawrence*, 281 Conn. 147, 155, 913 A.2d 428 (2007), that common-law power is now codified in Practice Book § 43-22, which provides: "The judicial authority may at any time correct an illegal sentence or other illegal disposition, or it may correct a sentence imposed in an illegal manner or any other disposition made in an illegal manner." So written, § 43-22 has been held to be "consistent with the broader common-law meaning of illegality, permitting correction of both illegal sentences and sentences imposed in an illegal manner." *State* v. *Parker*, 295 Conn. 825, 837, 992 A.2d 1103 (2010).

This court, in *State* v. *McNellis*, 15 Conn. App. 416, 443–44, 546 A.2d 292, cert. denied, 209 Conn. 809, 548 A.2d 441 (1988), explained that "[a]n 'illegal sentence' is essentially one which either exceeds the relevant statutory maximum limits, violates a defendant's right against double jeopardy, is ambiguous, or is internally contradictory." By contrast, the court explained, "[s]entences imposed in an illegal manner have been defined as being within the relevant statutory limits but . . .

imposed in a way which violates defendant's right . . . to be addressed personally at sentencing and to speak in mitigation of punishment . . . or his right to be sentenced by a judge relying on accurate information or considerations solely in the record, or his right that the government keep its plea agreement promises . . . ." (Internal quotation marks omitted.) Id., 444.

The state argues that the defendant's claim falls outside the narrow exceptions provided for in Practice Book § 43-22, as explained by this court in *State* v. *McNellis*, supra, 15 Conn. App. 443–44, and by our Supreme Court in *State* v. *Lawrence*, supra, 281 Conn. 158, because his claim attacks the validity of his conviction as opposed to his sentence. "The purpose of . . . § 43-22 is not to attack the validity of a conviction by setting it aside but, rather to correct an illegal sentence or disposition, or one imposed or made in an illegal manner." (Internal quotation marks omitted.) Id. We agree with the state that the court lacked jurisdiction to hear and adjudicate the defendant's amended motion to correct illegal sentence because his motion fell outside the narrow scope of § 43-22.

Although the defendant alleges that the state breached the terms of its plea agreement, which, under *State* v. *McNellis*, supra, 15 Conn. App. 443–44, would ordinarily constitute a claim that the sentence was imposed in an illegal manner, his current claim relates not to the state's alleged breach of his *second* plea agreement, pursuant to which the sentence here challenged was imposed, but to his *initial* plea agreement, which he claims not to have been enforced according to its terms. For this court to reach the merits of that claim and grant the relief the defendant requests would therefore require more than the correction of his current sentence. Instead, it would require the setting aside of his conviction for accessory to manslaughter in the first degree with a firearm, the reinstatement of the lesser charges to which the defendant pleaded guilty under his initial plea agreement, and the imposition of sentence on those charges under the terms of the initial plea agreement. Entering such orders is well beyond the narrow purpose of Practice Book § 43-22. That purpose, to reiterate, is to afford defendants an effective vehicle for challenging and correcting illegalities in their current sentences in connection with otherwise valid criminal convictions, not an alternative vehicle for challenging the validity of the underlying convictions themselves.

Here, then, because the defendant's amended motion to correct alleged that his current sentence is illegal because the conviction pursuant to which it was imposed resulted from the improper reinstatement of the original charge of murder, the motion is actually an attack on the validity of his conviction for accessory to manslaughter in the first degree with a firearm, which

"falls outside that set of narrow circumstances in which the court retains jurisdiction over a defendant" under Practice Book § 43-22. *State* v. *Lawrence*, supra, 281 Conn. 159. For that reason, the trial court's denial of that motion on the ground that the sentence therein challenged was itself imposed in a legal manner, pursuant to his valid, independently negotiated second plea agreement, was improper.

The form of the judgment is improper, the judgment is reversed and the case is remanded with direction to render judgment dismissing the defendant's amended motion to correct illegal sentence for lack of subject matter jurisdiction.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] Practice Book § 43-22 provides: "The judicial authority may at any time correct an illegal sentence or other illegal disposition, or it may correct a sentence imposed in an illegal manner or any other disposition made in an illegal manner."

[2] The following colloquy occurred before the sentencing court:

"[The Prosecutor]: Just one, may I inquire further in terms of—

"The Court:—sure.

"[The Prosecutor]:—the shots fired from the crowd. Which side of the street the shots came from, the right or the left, as they drove down the street?

"The Court: What side of the street?

"The Defendant: The left side, sir, Your Honor.

"The Court: Left side.

"The Defendant: The car was on the right side.

"The Court: What?

"The Defendant: The car was on the right side of the street.

"[Defense Counsel]: The shots came from the other direction?

"The Defendant: Yeah, the other direction.

"[Defense Counsel]: The shots came from the other direction from the crowd. The crowd was on the right and the shots came from the left, he says.

"[The Prosecutor]: Well, I guess—

"The Court:—you're going down Kensington; which direction are you headed?

"The Defendant: Toward Chapel.

"The Court: You're heading toward Chapel and the crowd is on the—

"The Defendant:—left—

"The Court:—driver's side or the passenger?

"The Defendant: Passenger, passenger.

"The Court: Passenger side?

"The Defendant: Yes.

"The Court: And the shots that were fired at the car, are they from the driver's side or the passenger side?

"The Defendant: They came from the driver's side of the [car]—

"The Court:—from the driver's side?

"The Defendant: Yeah.

"The Court: So, the crowd was on the passenger's side—the shots from the driver's side, right?

"The Defendant: Yes, sir.

"[The Prosecutor]: That's fine, thank you.

"The Court: Okay. And then you guys shot—

"The Defendant:—toward the crowd.

"The Court: Toward the passenger side?

"The Defendant: Yes."

[3] General Statutes § 51-296 (a) provides in relevant part: "In any criminal action . . . the court before which the matter is pending shall, if it determines after investigation by the public defender or his office that a defendant is indigent as defined under this chapter, designate a public defender, assistant public defender or deputy assistant public defender to represent such indigent defendant . . . ."